**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| THERSA OHAEME, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CAUSE NO.:  1:23-cv-00181-JMS-KMB |
| | ) | |
| ANDY MOHR AVON NISSAN, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Andy Mohr Avon Nissan, Inc. ("Andy Mohr"), by counsel, submits its Brief in

Support of Motion for Summary Judgment [Filing No. 48] on all claims in the Complaint [Filing

No. 1] filed by Plaintiff Theresa Ohaeme ("Ohaeme").

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Ohaeme was the top sales associate during her employment with Andy Mohr. Ohaeme is a

black female raised in Nigeria. She was hired immediately before COVID-19 and was so

successful that when other sales associates began to be laid off, she kept her job. Her coworkers

became jealous and began to envy her success and started playing pranks on her. They unplugged

the computer she used most and included her in their joke of passing a balloon around with a penis

drawn on it. She would sometimes make four or five sales in a day, and was at one point, as a

compliment, coined the "Nigerian Nightmare" for putting customers to sleep and selling them a

car. Ohaeme won the Nissan dealer employee spotlight for selling the most cars at any Nissan

dealership in February 2022.

Ohaeme was also an aggressive sales associate which led to some arguments with her

coworkers; one resulted in her being called a "black bitch" by a black co-worker. Even though

Ohaeme and her coworkers were competitive and sometimes argued, they also joked around. One

of her coworkers posted Tik Tok videos of Ohaeme at work putting her bare feet on her desk.

She complained about some of these instances to her General Manager Patrick Hurst ("Hurst") and Managers Nick Burd ("Burd") and Aaron Richardson ("Richardson"). As detailed below, each complaint was then promptly and appropriately addressed by Andy Mohr, and in accordance with its Equal Employment Opportunity policies. But Ohaeme now puts all of her alleged slights and complaints into one mix, and claims she was harassed and discriminated against due to sex or race, notwithstanding she was never disciplined or ever suffered any adverse action. She voluntarily resigned on March 14, 2022 (a little over two years after her employment began).

Ohaeme's Complaint incorrectly alleges she was harassed due to her sex and race and discriminated against because of her sex, race, and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). She also now claims (but not in her EEOC Charge) that her resignation amounted to a constructive discharge due to her sex, race, national origin, and engagement in protected activity in violation of Title VII and Section 1981.

Yet, the undisputed evidence shows that Ohaeme was a "fantastic" sales associate at Andy Mohr and was never disciplined or subjected to any adverse action, harassment, or discrimination. While she may have been the subject of jealousy of other sales associates, their actions were not because of her sex, race, or national origin and none rose to the level of severe and pervasive or unbearable. The undisputed evidence also reveals that Andy Mohr took prompt and reasonable action to remedy each complaint by Ohaeme and ensure such action did not occur again. Finally, some of Ohaeme's claims were not included in her Charge of Discrimination filed with the EEOC ("EEOC Charge") and are thus not properly before this Court. There are no genuine issues of material fact and summary judgment in Andy Mohr's favor should be granted.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**I.    Ohaeme's Employment and Success with Andy Mohr.**

1.    Andy Mohr hired Ohaeme as a sales associate on February 28, 2020. [Filing No. 48-4, p. 8 (Ohaeme Dep., p. 16, ll. 11-13)].

2.    Andy Mohr's staff of sales associates ranges from 15 to 20 employees. [Filing No. 48-1, p. 2 (Burd Aff. at ¶ 5)]. While Ohaeme was employed, the staff consisted of multiple races and nationalities, with about 50 percent of the sales associates being a race other than white. [Filing No. 48-1, p. 3 (Burd Aff. at ¶ 7)]. While Ohaeme was the only female sales associate (except for a brief period), 12 other female employees worked in a variety of roles within Andy Mohr while Ohaeme was employed. [Filing No. 48-1, p. 3 (Burd Aff. at ¶¶ 8-9)].

3.    During Ohaeme's employment with Andy Mohr she reported to then General Manager Hurst (white/male), and Managers Burd (white/male) and Richardson (white/male). [Filing No. 48-4, pp. 10-11 (Ohaeme Dep., p. 18, l. 9 - p. 19, l. 1)]; [Filing No.  48-6, pp. 10-11 (Burd Dep., p. 19, l. 8 - p. 20, l. 9)]; [Filing No. 48-5, pp. 4, 7, 8 (Hurst Dep., p. 9, l. 21 - p. 10, l. 23, p. 36, l. 16 - p. 37, l. 5)]. Burd hired Ohaeme. [Filing No. 48-6, p. 26 (Burd Dep., p. 35, ll. 19-21)]. When Burd hired Ohaeme he told her that women typically do better in this business then men and that at his family's dealership their top salespersons were women. [Filing No. 48-6, p. 27 (Burd Dep., p. 36, ll. 6-12)].

4.    While Ohaeme had never sold cars before working at Andy Mohr, she became the highest producing sales associate throughout her employment with Andy Mohr. [Filing No. 48-4, p. 13 (Ohaeme Dep., p. 21, ll. 18-19)]; [Filing No. 48-5, pp. 7, 8 (Hurst Dep., p. 33, ll. 1-3, p. 37, ll. 6-22)]. Ohaeme received the Nissan dealer employee spotlight for selling the most cars at any Nissan dealership in February 2022. [Filing No. 48-4, pp. 71, 121, 122, 147-153 (Ohaeme Dep.,

p. 79, ll. 17-20, p. 192, l. 13 - p. 193, l. 13, Exhibit E to Ohaeme Dep.)]. Ohaeme was a "fantastic" car salesperson. [Filing No. 48-6, p. 14 (Burd Dep., p. 23, ll. 5-6)].

5.    Ohaeme was never disciplined during her employment with Andy Mohr. [Filing No. 48-2, p. 5 (Hurst Aff., ¶ 17)].

6.    Both supervisors and employees of Andy Mohr were given anti-harassment training once a year. [Filing No. 48-6, pp. 6, 7 (Burd Dep., p. 15, ll. 5-21, p. 16, ll. 13-24)]. Andy Mohr also has a written policy prohibiting discrimination and harassment that addresses how and to whom discrimination and harassment should be reported. [Filing No. 48-1, p. 3 (Burd Aff. at ¶ 10); [Filing No. 48-1, pp. 9-11 (AndyMohr_000093-95)]. Ohaeme was aware and had access to these policies. [Filing No. 48-4, p. 83 (Ohaeme Dep., p. 91, ll. 3-18)].

## II.    Ohaeme's Relationship with her Coworkers and Incidents at Work.

7.    At the start of her employment, Ohaeme considered herself to be friends with all her coworkers. [Filing No. 48-4, p. 22 (Ohaeme Dep., p. 30, ll. 5-16)]. However, her relationship with her coworkers began to change about two months into her employment when COVID-19 began and many of her coworkers were laid off, but she was not. [Filing No. 48-4, pp. 22-24 (Ohaeme Dep., p. 30, l. 17 - p. 32, l. 7)]. Additionally, coworkers were jealous about her quick success and rise to the top sales associate position at Andy Mohr, and the environment was competitive because sales associates' compensation was based on sale commissions. [Filing No. 48-4, pp. 24-26 (Ohaeme Dep., p. 32, l. 8 - p. 34, l. 1)]; [Filing No. 48-1, p. 3 (Burd Aff. at ¶ 13)].

8.    Because of the competitive nature of the sales associates each fighting for their own commissions, disputes occur regarding how customers are assigned and who should receive credit for the sale of a car. [Filing No. 48-1, p. 4 (Burd Aff. at ¶ 15)]. Ohaeme claims that her customers and sales were taken and given to other sales associates because she sold more cars than others

(not because of her sex or race). [Filing No. 48-4, pp. 73, 75, 78 (Ohaeme Dep., p. 81, l. 8-14, p. 83, ll. 3 - 18, p. 86, ll. 1-10)]. However, the policy is if a sales associate who previously handled the customer is not present, or a "house deal" comes into the dealership, management determines which sales associate takes the deal; Ohaeme was given these house deals like every other sales associate and treated like everyone else. [Filing No. 48-5, p. 16 (Hurst Dep., p. 91, ll. 6-23)]; [Filing No. 48-4, pp. 82-83 (Ohaeme Dep., p. 90, l. 13 - p. 91, l. 2)]. Sometimes this results in a "split-deal" where two sales associates share the commission on the sale. [Filing No. 48-5, p. 16 (Hurst Dep., p. 91, l. 15 - p. 92, l. 9); [Filing No. 48-6, p. 28 (Burd Dep., p. 37, ll. 13-24)]. Ohaeme admits she has participated in split deals. [Filing No. 48-4, pp. 77-78, 80 (Ohaeme Dep., p. 85, l. 2 - p. 86, l. 25, p. 88, ll. 13-15)].

9.    Ohaeme and her coworkers frequently joked around at work. [Filing No. 48-4, p. 28 (Ohaeme Dep., p. 36, ll. 16-20)]. It was common for coworkers to play pranks on each other. [Filing No. 48-1, p. 4 (Burd Aff. at ¶ 19)]. Some examples of pranks included taking all of someone's business cards and pens off their desk or covering someone's computer with post-it notes. [*Id.*].

10.    As a sales associate, Ohaeme had a partitioned desk in the sales bullpen with a computer that she could use to complete her sales paperwork. [Filing No. 48-4, pp. 20-22 (Ohaeme Dep., p. 28, l. 16 - p. 30, l. 4)]. But any sales associate could use any computer within the dealership to complete sales paperwork, including one of four computers on the showroom floor. [Filing No. 48-5, p. 16 (Hurst Dep., p. 89, ll. 8-15)]; [Filing No. 48-1, p. 4 (Burd Aff. at ¶ 18)]. Ohaeme was not required to use any particular computer. [Filing No. 48-5, p. 16 (Hurst Dep., p. 89, ll. 8-15)]; [Filing No. 48-1, p. 4 (Burd Aff. at ¶ 18)].

11.    Beginning in May 2020, Ohaeme began having issues with someone unplugging

the computer she used most often. [Filing No. 48-4, p. 34 (Ohaeme Dep., p. 42, ll. 11-24)]. She suspected the first time it occurred that the cleaners did it. [Filing No. 48-4, p. 34 (Ohaeme Dep., p. 42, ll. 19-24)]. About two weeks later, it happened again; this time during the day. [Filing No. 48-4, p. 35 (Ohaeme Dep., p. 43, ll. 1-22)]. A month later, it occurred for the third time. [Filing No. 48-4, pp. 35-36 (Ohaeme Dep., p. 43, l. 23 - p. 44, l. 10)]. Ohaeme reported this third instance to Burd. [Filing No. 48-4, pp. 35-36 (Ohaeme Dep., p. 43, l. 23 - p. 44, l. 10)].

12.    Ohaeme did not know who was unplugging the computer, but she thought it had something to do with someone wanting to "interrupt [her] work for the day" as it always occurred after she had sold four or five cars. [Filing No. 48-4, p. 36 (Ohaeme Dep., p. 44, ll. 6-23)].

13.    In late 2020, the computer at Ohaeme's desk was unplugged a fourth time. [Filing No. 48-4, pp. 36-37 (Ohaeme Dep., p. 44, l. 23 - p. 45, l. 19)]. This occurrence was reported to Hurst, and he addressed this issue with the entire sales team in a meeting and explained that such behavior needed to immediately stop. [Filing No. 48-4, pp. 36-37 (Ohaeme Dep., p. 44, l. 23 – p. 45, l. 19)]; [Filing No. 48-2, p. 3 (Hurst Aff. at ¶ 7)].

14.    During her downtime at work, Ohaeme and her coworkers discussed various aspects of life, including other coworkers' curiosity about life in Nigeria. [Filing No. 48-4, pp. 37-42 (Ohaeme Dep., p. 45, l. 18 - p. 50, l. 12)]. Coworkers asked Ohaeme about poverty in Nigeria, her reasons for moving to America, and whether there were lions and tigers in Nigeria. [Filing No. 48-4, pp. 37-42 (Ohaeme Dep., p. 45, l. 21 - p. 50, l. 12); [Filing No. 48-1, p. 5 (Burd Aff. at ¶ 20)]. Nevertheless Ohaeme asked her coworkers to stop making these comments. [Filing No. 48-4, pp. 39-40 (Ohaeme Dep., p. 47, l. 1 - p. 48, l. 5)]. They largely did stop. Ohaeme says the poverty question/comment was thereafter made only once more by another sales associate, Caleb Derbyshire ("Derbyshire") (black/male), and she did not recall whether he was present when she

asked that these comments stop. [Filing No. 48-4, p. 39 (Ohaeme Dep., p. 47, ll. 7-22)]. Ohaeme also says that the lions and tigers question was made only once more by Dajuan Jones ("Jones") (black/male), and she told him to stop. The two then had an argument. [Filing No. 48-4, pp. 39-40 (Ohaeme Dep., p. 47, l. 23 - p. 48, l. 9)]. Ohaeme says that the argument ended with Jones telling her he knew where she lived. [Filing No. 48-4, p. 40 (Ohaeme Dep., p. 48, ll. 7-17)]. She reported this to Burd and Richardson, who assured Ohaeme that Jones would take no action against her. [Filing No. 48-4, pp. 40-42 (Ohaeme Dep., p. 48, l. 18 - p. 50, l. 12)]. Jones took no further action against Ohaeme and did not make any similar comments to her. [Filing No. 48-4, p. 42 (Ohaeme Dep., p. 50, ll. 10-12)].

15.    In early 2021, the computer at Ohaeme's desk was unplugged again, and she complained to Hurst. [Filing No. 48-4, p. 42 (Ohaeme Dep., p. 50, ll. 19-22)]. Hurst again talked to all employees and told them to stop and that he would put cameras in the bullpen to deter this conduct. [Filing No. 48-4, p. 42 (Ohaeme Dep., p. 50, ll. 19-22)]; [Filing No. 48-2, p. 3 (Hurst Aff. at ¶ 8)].

16.    In March 2021, the computer at Ohaeme's desk was unplugged for the sixth time. [Filing No. 48-4, pp. 42-43 (Ohaeme Dep., p. 50, l. 22 - p. 51, l. 2)]. Ohaeme reported this instance to Richardson. [Filing No. 48-4, pp. 42-43 (Ohaeme Dep., p. 50, l. 22 - p. 51, l. 2)]. After this instance, it did not happen again for many months until late 2021. [Filing No. 48-4, p. 43 (Ohaeme Dep., p. 51, ll. 5-6)].

17.    Ohaeme continued to remain the top sales associate at Andy Mohr throughout her employment. [Filing No. 48-5, pp. 7, 8 (Hurst Dep., p. 33, ll. 1-3, p. 37, ll. 6-22)]. Because Ohaeme was so successful, sometimes selling 50 to 60 cars a month (500 cars in a year), coworkers and managers often asked how she did it and that they had never seen someone so successful in car

sales. [Filing No. 48-4, pp. 68-70 (Ohaeme Dep., p. 76, l. 23 - p. 78, l. 25)]. Ohaeme speculated the comments were made because she was a woman but on at least one occasion, Hurst clarified that he had just never seen it done before by anyone. [Filing No. 48-4, pp. 69-70, 106 (Ohaeme Dep., p. 77, l. 18 - p. 78, l. 3, p. 139, l. 20)].

18.    On May 8, 2021, Ohaeme discovered a balloon with a penis drawn on it on her chair. [Filing No. 48-4, pp. 32-33, 131, 170, 142 (Ohaeme Dep., p. 40, l. 9 - p. 41, l. 1, p. 202, ll. 7-25, Exhibit S to Ohaeme Dep., p. 222, ll. 20-22)]. Ohaeme immediately texted Hurst a photo of the balloon with the text "someone put this on my chair." [Filing No. 48-4, pp. 131, 170 (Ohaeme Dep., p. 202, ll. 7-25, Exhibit S to Ohaeme Dep.)]. Hurst responded that he would handle the situation. [Filing No. 48-4, pp. 132, 170 (Ohaeme Dep., p. 203, ll. 1-3, Exhibit S to Ohaeme Dep.)]. Ohaeme did not know who put the balloon on her chair, so Hurst spoke with the entire sales team the next day. [Filing No. 48-5, p. 8 (Hurst Dep., p. 38, l. 10 - p. 39, l. 2)]; [Filing No. 48-4, pp. 93-95 (Ohaeme Dep., p. 101, l. 12 - p. 103, l. 5)]. After no one came forward to say they had done it, Hurst withheld the entire team's weekly SPIFF bonus, to prompt the person who did it to come forward. [Filing No. 48-5, p. 8 (Hurst Dep., p. 38, l. 10 - p. 39, l. 2)]; [Filing No. 48-4, pp. 93-95 (Ohaeme Dep., p. 101, l. 12 - p. 103, l. 5)]; [Filing No. 48-6, p. 14 (Burd Dep. p. 23, ll. 16-22)]. Hurst then also reviewed camera footage and interviewed multiple sales associates individually to determine who did this. [Filing No. 48-5, pp. 8-9 (Hurst Dep., p. 39, l. 3 - p. 41, l. 1)]. Through the investigation, however, Andy Mohr determined that the balloon was initially placed on Derbyshire's (black/male) desk by an unknown person, and that he moved it to Ohaeme's desk, but no one admitted they had created the balloon and the investigation could not determine who did it. [Filing No. 48-1, p. 5 (Burd Aff. at ¶ 21)]; [Filing No. 48-5, pp. 8-9 (Hurst Dep., p. 39, l. 3 - p. 41, l. 1)]; [Filing No. 48-6, p. 16 (Burd Dep. p. 25, ll. 20-25)]. The entire sales team was

disciplined for not saying who started the balloon by not being given their SPIFF - -an incentive bonus on top of their normal payment [Filing No.  48-6, p. 15 (Burd Dep., p. 24, ll. 4-15)].

19.     On or around the summer of 2021, Ohaeme had an argument with another sales associate, Myron Jackson ("Jackson") (black/male), and Jackson called Ohaeme a "black bitch." [Filing No. 48-4, pp. 54-55 (Ohaeme Dep., p. 62, l. 22 – p. 63, l. 20)]; [Filing No. 48-6, p. 21 (Burd Dep., p. 30, ll. 18-20)]. Ohaeme reported this conversation to Burd. [Filing No. 48-6, pp. 21-22 (Burd Dep., p. 30, l. 10 - p. 31, l. 16)]. Burd spoke with Jackson and told him it was unacceptable and could not happen again, and to apologize. [Filing No. 48-6, pp. 21-22 (Burd Dep., p. 30, l. 10 – p. 31, l. 16)]. Jackson agreed it would not happen again and apologized to Ohaeme. [Filing No. 48-6, pp. 21-22 (Burd Dep., p. 30, l. 10 - p. 31, l. 16)]. Sometime thereafter, Ohaeme claims she overheard a group of African American sales associates make this comment again, but it was not made to her directly, only when she passed by. [Filing No. 48-4, pp. 55-56 (Ohaeme Dep., p. 63, l. 21 - p. 64, l. 16)]. Yet, Ohaeme complained to Hurst about this instance as well, and Hurst addressed this by having a group conversation with all possible sales associates that may have been involved including: Jackson (black/male), Jones (black/male), David Johnson (black/male), Derbyshire (black/male), and Vincent Mitchell (black/male). [Filing No. 48-4, pp. 113-114 (Ohaeme Dep., p. 184, l. 18 - p. 185, l. 12)]; [Filing No. 48-5, pp. 7, 12-13 (Hurst Dep., p. 34, l. 23-24, p. 56, l. 13 - p. 59, l. 1)]; [Filing No. 48-2, p. 3 (Hurst Aff. at ¶ 10)]. Hurst gave each of these employees a verbal warning and this conduct did not occur again. [Filing No. 48-5, p. 13 (Hurst Dep., p. 58, l. 21 - p. 59, l. 11)]; [Filing No. 48-4, pp. 113-114 (Ohaeme Dep., p. 184, l. 18 - p. 185, l. 12)].

20.     In September 2021, due to Ohaeme's success in sales, Richardson gave Ohaeme the nickname of "Nigerian Nightmare" at a sales associate meeting. [Filing No. 48-4, pp. 57-59

(Ohaeme Dep., p. 65, l. 22 - p. 67, l. 6)]; [Filing No. 48-5, p. 11 (Hurst Dep., p. 49, l. 20 - p. 52, l. 22)]; [Filing No. 48-6, pp. 18-20 (Burd Dep., p. 27, l. 20 - p. 29, l. 22)]. The nickname was meant to be a compliment as Ohaeme had sold so many cars it was said "if a customer gets her as a salesperson . . . she is going to basically put them to sleep and sell them a car." [Filing No. 48-5, p. 11 (Hurst Dep., p. 52, ll. 1-9)]; [Filing No. 48-2, p. 4 (Hurst Aff. at ¶ 11)]. Many of the other sales associates had nicknames as well. [Filing No. 48-1, pp. 5-6 (Burd Aff. at ¶ 23)]. Ohaeme appeared to enjoy the nickname and never said that it was an issue. [Filing No. 48-6, p. 19 (Burd Dep., p. 28, ll. 6-12)]. Indeed, Burd recalls that Ohaeme laughed about it. [Filing No. 48-6, p. 20 (Burd Dep., p. 29, ll. 20-22)]. Yet, after hearing about this new nickname, Hurst told Richardson not to use this nickname because Ohaeme might not like it. [Filing No. 48-5, p. 11 (Hurst Dep., p. 51, ll. 16-21)]; [Filing No. 48-2, p. 4 (Hurst Aff. at ¶ 11)]. After this, the name was erased from the sales board and no longer used. [*Id.*].

21.    In either November or December 2021, the computer at Ohaeme's desk was unplugged again. [Filing No. 48-4, p. 43 (Ohaeme Dep., p. 51, ll. 5-6)]. Ohaeme reported this instance to Hurst. [Filing No. 48-4, p. 43 (Ohaeme Dep., p. 51, ll. 6-15)]. Neither Ohaeme nor management at Andy Mohr knew who was unplugging the computer. [Filing No. 48-4, p. 43 (Ohaeme Dep., p. 51, ll. 12-23)]; [Filing No. 48-2, p. 4 (Hurst Aff. at ¶ 12)]; [Filing No 48-1, p. 4 (Burd Aff. at ¶ 19)].

### III.    Incidents Involving Derbyshire.

22.    On January 28, 2022, Derbyshire posted a video on his own personal Tik Tok page of Ohaeme taking off her socks at her desk and touching her bare toes. [Filing No. 48-3, p. 3 (Cimera Aff. at ¶ 6)]; [Filing No. 48-3, p. 16 (Exhibit B-AndyMohr_000602)]. In the video, Derbyshire states: "I'm minding my own business at my desk and look over to see this." [*Id.*]. A

Tik Tok subscriber with the name "6natas9", who is *not* an Andy Mohr employee thereafter commented:



[*Id.*]. When questioned about this occurrence, Ohaeme acknowledged she had taken off her shoes and socks and put her foot on her desk, supposedly to get the snow out of her boot. [Filing No. 48-4, pp. 28-29, 46-47 (Ohaeme Dep., p. 36, l. 21 - p. 37, l. 11, p. 54, l. 23 - p. 55, l. 8)].

23.     Derbyshire also posted two other Tik Tok videos on February 5, 2022 of Ohaeme joking about a new trade-in with a PA system. [Filing No. 48-3, p. 3 (Cimera Aff. at ¶ 6); [Filing No. 48-3, p. 18 (Exhibit C-AndyMohr_000603)]; [Filing No. 48-3, p. 20 (Exhibit D-AndyMohr_000604)]; [Filing No. 48-4, pp. 27-28 (Ohaeme Dep., p. 35, l. 22 - p. 36, l. 15)].

24.     Derbyshire posted another video of Ohaeme on his Tik Tok page on February 9, 2022 showing Ohaeme after she fell in the snow while cleaning off cars. [Filing No. 48-3, p. 3 (Cimera Aff. at ¶ 6); [Filing No. 48, 3, p. 22 (Exhibit E-AndyMohr_000594)]; [Filing No. 48-4, pp. 89-91 (Ohaeme Dep., p. 97, l. 5 - p. 99, l. 19)].

25.     On February 11, 2022, Derbyshire believed he should have received credit for a sale, but Burd determined it would be credited to Ohaeme. [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 24)]. In anger, Derbyshire went to the sales office and unplugged the computer at Ohaeme's desk. [Filing No. 48-4, pp. 43-45, 139 (Ohaeme Dep., p. 51, l. 23 - p. 53, l. 21, p. 219, ll. 5-23)]; [Filing No. 48-6, p. 23 (Burd Dep., p. 32, ll. 4 – 13)]; [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 24)]. Ohaeme caught Derbyshire unplugging the computer. [Filing No. 48-4, pp. 43-45 (Ohaeme Dep., p. 51, l. 23 - p. 53, l. 21)]. Derbyshire then stormed out of the dealership. [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 24)]. Ohaeme reported this to Burd who thereafter told Derbyshire not to return to work for

the rest of the day and the next day. [Filing No. 48-4, p. 45 (Ohaeme Dep. P. 53, ll. 8-21)]; [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 24)].

26.     When Derbyshire next reported to work he was instructed by Burd to apologize to Ohaeme, and he did. [Filing No. 48-6, p. 31 (Burd Dep., p. 40, ll. 19-21)]; [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 24)]. Burd also addressed the entire sales team and explained that the rules for assigning customers would be strictly enforced, and that aggressive posturing for sales credit would not be tolerated. [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 24)].

27.     On February 12th, Derbyshire defended and posted a fifth Tik Tok video regarding Ohaeme, in response to the comment made by "6natas9" on the January 28, 2022 Tik Tok. [Filing No. 48-3, p. 3 (Cimera Aff. at ¶ 6)]; [Filing No. 48-3, p. 24 (Exhibit F-AndyMohr_000601)]. The text on the video shows the original comment Derbyshire is replying to and states: "Was I Wrong Or Is This Guy Racist?". [*Id.*]. Derbyshire explains that he had not replied to this comment because he was trying to think of a professional way to do so. [*Id.*]. Derbyshire calls the commenter, "6natas9", racist and says that Derbyshire is of mixed race, has been in the car business for six years, is successful, and most of his friends at the dealership that are successful are also black. [*Id.*]. Derbyshire then states: "This woman might be the biggest cunt we have, everyone might hate her, but that has nothing to do with her race. I have met plenty of amazing, wonderful Nigerian people – they typically have a stronger work ethic than us Americans do – race has nothing to do with it. And as far as lazy goes, she is the highest paid salesperson that we have, so your racist argument does not hold." [*Id.*].

28.     Ohaeme discovered the January 28th, February 5th, February 9th and February 12th videos and brought them to Hurst's attention. [Filing No. 48-4, pp. 45-47 (Ohaeme Dep., p. 53, l. 23 - p. 55, l. 21)]. Hurst required Derbyshire to take all videos about Ohaeme down and issued him

a disciplinary written warning for his conduct for the posting of the videos of Ohaeme and his comments regarding her in the videos. [Filing No. 48-2, p. 4 (Hurst Aff. at ¶ 13)]; [Filing No. 48-2, p. 7 (AndyMohr_000027)]; [Filing No. 48-4, p. 48 (Ohaeme Dep., p. 56, ll. 7-11)]. Derbyshire also had to write Ohaeme an apology, which he did:

> Theresa,
>
> I want to write to you to apologize for my behavior these past few months. I have been frustrated with you and decided to turn to social media. It was rude and unprofessional of me and I am sorry. We've had a few good moments together joking around, like when you were playing with the truck radio. We've also had some issues and arguments like the issue last Friday. I do try and be nice to you and help you but it seems like we always end up in an argument. I want to apologize for my part in all of our fights. I am going to try and conduct myself in a much professional manner. I would like to move on from this and put it in the past. Starting now I have nothing against you. I do feel like we should avoid each other for the time being and do our own things. We are both here to make money. Maybe in the future we can be back on good terms but for now I think it would be good if we could just not be on bad terms with each other. Please accept my sincerest apology.
>
> Caleb Derbyshire
>
> **Derby's Performance Sales @ Andy Mohr Automotive**
> *8867 East US Highway 36 Avon, IN 46123*
> *Caleb Derbyshire  (317) 384-4510*

[Filing No. 48-2, p. 4 (Hurst Aff. at ¶ 13)]; [Filing No. 48-2, p. 9 (AndyMohr_000028)]; [Filing No. 48-4, p. 146 (Ohaeme Dep., p. 58, ll. 5-8, p. 195, l. 10-12, Exhibit C to Ohaeme Dep.)].

## IV.    Ohaeme Resigns from Andy Mohr.

29.    On or about February 14, 2022, Ohaeme told Hurst she was not sure if she wanted to work at Andy Mohr any longer. [Filing No. 48-2, p. 4 (Hurst Aff. at ¶ 14)]; [Filing No. 48-4, pp. 51-52 (Ohaeme Dep., p. 59, l. 17 - p. 60, l. 5)]. Ohaeme claims that during this conversation Hurst told her no one else was having issues with co-workers like she was, he was tired of it, and if it kept happening, he would have to "let [her] go." [Filing No. 48-4, p. 62 (Ohaeme Dep., p. 70, ll. 14-21]. Ohaeme says she asked if Hurst was "threatening [her] on [her] job?", to which he responded no. [Filing No. 48-4, pp. 62-63 (Ohaeme Dep., p. 70, l. 22 - p. 71, l. 5]. Ohaeme interpreted it as a threat, even though Hurst said it was not. [Filing No. 48-4, p. 62 (Ohaeme Dep., p. 70, ll. 6-14].

30.     To convince Ohaeme to continue her employment at Andy Mohr, Hurst and Eric Spersrud ("Spersrud"), Andy Mohr's Director of Operations, met with Ohaeme the next day, February 15, 2022. [Filing No. 48-2, p. 5 (Hurst Aff. at ¶ 15)]; [Filing No. 48-5, pp. 52-53 (Ohaeme Dep., p. 60, l. 15 - p. 61, l. 6)]. Spersrud offered to move Ohaeme to another store, but Ohaeme refused before even knowing the details. [Filing No. 48-4, pp. 52-53 (Ohaeme Dep., p. 60, l. 15 - p. 61, l. 24)]. Ohaeme did <u>not</u> claim she had been harassed or discriminated against over the course of her employment in that meeting. [Filing No. 48-2, p. 5 (Hurst Aff. at ¶ 15)].

31.     Ohaeme left the meeting with Hurst and Spersrud, saying she would think about whether she still wanted to work at Andy Mohr. [Filing No. 48-4, p. 30 (Ohaeme Dep., p. 38, ll. 8 – 20)]. But, Ohaeme never returned to work. [Filing No. 48-4, p. 30 (Ohaeme Dep., p. 38, ll. 8-20)]; [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 25)].

32.     On March 9, 2022, Ohaeme filed her EEOC Charge without telling Andy Mohr she had done so. [Filing No. 48-4, pp. 85-86, 154-157 (Ohaeme Dep., p. 93, l. 6 - p. 94, l. 4, Exhibit G to Ohaeme Dep.)].

33.     On March 14, 2022, Ohaeme resigned her employment at Andy Mohr by sending the following text message to Hurst:

> And also I am not longer going to be working for Andymohr. I resign

[Filing No. 48-2, p. 5 (Hurst Aff. at ¶ 16)]; [Filing No. 48-2, p. 11 (AndyMohr_000038)]; [Filing No. 48-4, pp. 99, 141, 158-169 (Ohaeme Dep., p. 107, ll. 8-9, p. 221, ll. 11-21, Exhibit O to Ohaeme Dep.)]. Hurst accepted the resignation. [Filing No. 48-4, p. 142 (Ohaeme Dep., p. 222, ll. 13-16)]; [Filing No. 48-2, p. 5 (Hurst Aff. at ¶ 16)]; [Filing No. 48-2, p. 11 (AndyMohr_000038)].

34.     Andy Mohr valued Ohaeme as a person and for her work and work ethic. [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 27)]. She was considered a member of the Andy Mohr family and

she had even celebrated Thanksgiving with Burd's family. [Filing No. 48-6, p. 33 (Burd Dep., p. 42, ll. 20-25)]. Her resignation was a loss to Andy Mohr. [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 27)].

## SUMMARY JUDGMENT STANDARD

Summary judgment is "mandated . . . where there are no disputed issues of material fact and the movant must prevail as a matter of law." *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994); Fed. R. Civ. P. 56(c). The initial burden is on the moving party to demonstrate that there are no genuine questions of material fact and that judgment as a matter of law should be granted in its favor. *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). Once the moving party has met this initial burden, the nonmovant has the responsibility of going beyond the pleadings and setting forth specific facts demonstrating the existence of a genuine issue of fact for trial. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990).

## ARGUMENT

I.    **Andy Mohr is Entitled to Summary Judgment on Ohaeme's Harassment Claims.**

Andy Mohr is entitled to summary judgment on Ohaeme's harassment claims based on her sex and race. Andy Mohr took prompt, remedial action against every complaint made by Ohaeme to ensure such actions did not occur again. Additionally, none of the claimed instances would be objectively offensive to a reasonable person or rise to the level of being severe or pervasive. Finally, there is no evidence to suggest that the instances she claimed is harassment occurred because of Ohaeme's sex or race.

To survive summary judgment on this claim, Ohaeme must establish: (1) she was subjected to unwelcome harassment; (2) the harassment was *based on* her sex and/or race; (3) the harassment was "*sufficiently severe or pervasive* so as to alter the condition of her employment and create a

hostile or abusive atmosphere"; and (4) there is a *basis for employer liability. Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007) (emphasis added). *See also Betters v. GEO Grp., Inc.*, No. 1:12-cv-00538-JMS-MJD, 2013 WL 3815629, at *5 (S.D. Ind. July 22, 2013). Accordingly, there must be some connection between the alleged harassment and Ohaeme's sex and/or race. "[N]ot every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a [protected class]." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016).

In determining whether conduct is severe or pervasive, courts consider the totality of the circumstances, which analyzes the following factors: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022). The Seventh Circuit has held that even when employees alleged they had to perform harder jobs than white employees, were not allowed to bid for other jobs, were denied overtime and opportunities for bonuses, worked as temporary employees for longer than others, and were treated more harshly than white employees, such allegations were not severe and pervasive sufficient to defeat summary judgment. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022). And, the subjective beliefs of a plaintiff are not enough to create a genuine issue of material fact to defeat summary judgment. *See id.*

Here, Ohaeme "appear[s] to have simply collected the sum total of all the unpleasant events in [her] work history . . ., dumped them into the legal mixing bowl of this lawsuit, set the Title VII-blender to puree and poured the resulting blob on the court." *Davis v. Con-Way Transp. Cent.*

*Express, Inc.*, 368 F.3d 776, 782 (7th Cir. 2004) (criticizing this approach while granting the employer summary judgment). Thus, we must unfortunately analyze each incident including who the alleged harasser was, what actions Andy Mohr took because of Ohaeme's complaints, and whether the incidents rise level of harassment for purposes of Title VII they do not.

Additionally, different standards apply when evaluating an employer's liability for harassment depending on whether the alleged harasser is the victim's supervisor or coworker. *Paschall*, 28 F.4th at 813. In the instance of supervisor harassment, "an employer is strictly liable when a 'supervisor's harassment culminates in a *tangible employment action*.'" *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (emphasis added)). A tangible employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* And if the alleged harasser is a coworker of the victim, "the employer is liable only if it was *negligent* in controlling working conditions." *Id.* (emphasis added). Here, there is no genuine issue of material fact on multiple required elements for a viable harassment claim.

1. <u>Ohaeme Cannot Prove that the Incidents She Alleges Occurred Because of Her Sex and/or Race.</u>

Much of the alleged harassment by Ohaeme has no relation to her sex and/or race. Ohaeme herself points to no evidence these incidents were because of her sex or race. Specifically, the computer unplugging, the alleged nickname of "Nigerian Nightmare", the innocuous references to lions and tigers or poverty in Nigeria, and the allegation that customers and sales were taken away from her and given to other sales associates, do not relate to her sex and/or race. Ohaeme admits she thought the unplugging of the computer had something to do with someone wanting to "interrupt [her] work for the day" as it always occurred after she had sold multiple cars in one day.

[Filing No. 48-4, p. 36 (Ohaeme Dep., p. 44, ll. 6 – 23)]. She admits her sales and/or customers were allegedly taken away because she sold more cars than other sales associates. [Filing No. 48-4, pp. 73, 75, 78 (Ohaeme Dep., p. 81, l. 8 – 14, p. 83, ll. 3 – 18, p. 86, ll. 1 – 10)]. By her own admissions, these incidents were related to her success as a sales associate, not her sex or race. While the nickname "Nigerian Nightmare" and the questions and curiosity about lions and tigers and poverty in Nigeria are related to Ohaeme's national origin, they are not in any way related to her race.[1] Thus, as to these specific incidents, her claims of harassment fail as she cannot prove that the incidents were in any way related to her sex and/or race. *Cole*, 838 F.3d at 895 – 96.

Additionally, many of Ohaeme's claimed instances of harassment based on her race were perpetrated by members of the same race as her, *i.e.* Derbyshire, Jones, and Jackson. While there is no conclusive presumption someone of the same race will not discriminate against another person of the same race, it is implausible, and is relevant that many of Ohaeme's alleged harassers are of the same race as she is. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 – 82 (1998); *Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 574 (7th Cir. 2021) (same race supports finding that race was not a motivating factor). Further detail regarding the evidence that these incidents were not on account of her sex and/or race follow immediately below.

2. _None of the Incidents Are Sufficiently Severe or Pervasive as Required by Title VII._

The isolated instances of alleged harassment that Ohaeme points to, do not meet the burden of "sufficiently severe or pervasive" under Title VII. The alleged instances of harassment–taken as a whole or individually–fail to meet this necessary burden. Because most instances have different alleged harassers, an analysis of the incidents is required.

---

[1] A review of Ohaeme's Complaint [Filing No. 1] and her Statement of Claims [Filing No. 39] reveals that she has not alleged a claim of harassment based on her national origin.

a. Unknown Coworkers.

In many instances Ohaeme now complains of the person who allegedly acted is unknown still today. First, Ohaeme claims the computer at her desk was unplugged eight times throughout her two years of employment at Andy Mohr. For seven of those instances, neither Ohaeme nor Andy Mohr were able to determine who did the unplugging. However, as a deterrent, Andy Mohr addressed all sales associates two separate times (once in 2020 and again in 2021) indicating this behavior would not be tolerated and even threatened to put cameras in to deter this conduct. [Filing No. 48-44, pp. 36-37, 42 (Ohaeme Dep., p. 44, l. 23 - p. 45, l. 19, p. 50, ll. 19-22)]; [Filing No. 48-2, p. 3 (Hurst Aff. at ¶¶ 7-8)]. And unplugging someone's computer is not "severe and pervasive" harassment. It is not so offensive to a reasonable person, and other sales associates have had various pranks played on them throughout their employment as well. It is not physically threatening or humiliating, nor did it interfere with Ohaeme's work because she was able to use any computer in the dealership. [Filing No. 48-5, p. 16 (Hurst Dep., p. 89, ll. 8-15)]; [Filing No. 48-1, p. 4 (Burd Aff. at ¶ 18)]. It does not rise to the level of actionable harassment under Title VII. *See Kampmier*, 472 F.3d at 941 ("[M]inor or isolated incidents are generally insufficient to rise to the level of objectively offensive conduct.").

Second, on May 8, 2021, a balloon with a penis drawn on it was placed on her chair. This occurred just one time. [*Id*.]. After being advised, Hurst spoke with the entire sales team, withheld the SPIFF bonus from the entire sales team, reviewed camara footage, and interviewed multiple sales associates individually to determine who could have done this, but the investigation did not provide evidence to support who created this balloon. [Filing No. 48-6, p. 15 (Burd Dep., p. 24, ll. 4-15)]; [Filing No. 48-5, pp. 8-9 (Hurst Dep., p. 38, l. 10 - p. 41, l. 1)]. Andy Mohr's investigation and withholding of bonuses was successful, however, because this act was not repeated. And this

action was not initially directed at Ohaeme, it was directed at Derbyshire. [Filing No. 48-1, p. 5 (Burd Aff. at ¶ 21)]. Moving a balloon with male genitals drawn on it from one desk to another coworker's chair on one occasion does not rise to the level of being severe and pervasive. *See Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708 (7th Cir. 1995) (holding two instances of physical touching of a plaintiff, including grabbing her butt and stroking her leg with a toe, and minor comments created an unpleasant working environment but did not rise to the level of severe and pervasive).

b.  Myron Jackson.

Jackson, a black male, was involved in one incident. Ohaeme and Jackson had a disagreement and Jackson called Ohaeme a "black bitch." Ohaeme reported this to Burd who immediately addressed Jackson. [Filing No. 48-6, pp. 21-22 (Burd Dep., p. 30, l. 10 - p. 31, l. 16)]. Jackson explained it would not happen again and apologized to Ohaeme. [Filing No. 48-6, pp. 21-22 (Burd Dep., p. 30, l. 10 - p. 31, l. 16)]. Thereafter, Ohaeme says she overheard groups of African American sales associates making this comment as she passed by and complained to Hurst. [Filing No. 48-2, p. 3 (Hurst Aff. at ¶ 10)]. This group included Jackson, Jones, David Johnson, Derbyshire, and Vincent Mitchell, all black males. [*Id.*]. Hurst addressed this group and gave each employee a verbal warning. [*Id.*]. This behavior was not repeated. [Filing No. 48-4, pp. 113-114 (Ohaeme Dep., p. 184, l. 18 - p. 185, l. 12)]. Both Jackson and Ohaeme are black, and all the sales associates in the group where this was repeated from are also black. Considering Andy Mohr's action to end this alleged harassment, that it was not physically threatening, did not interfere with Ohaeme's work performance, and in the latter occasions was not even directed at Ohaeme, it does not rise to the level of actionable severe and pervasive harassment under Title VII. *Paschall*, 28 F.4th at 814 – 16.

c.   Dajuan Jones.

The incident that Jones was involved in that Ohaeme raises is the general conversation about life in Nigeria, which involved questions about whether there were lions and tigers where Ohaeme was from in Nigeria. [Filing No. 48-4, pp. 39-40 (Ohaeme Dep., p. 47, l. 23 - p. 48, l. 9)]. While these questions appear innocent, Ohaeme asked Jones to stop and it resulted in an argument that ended with Jones telling Ohaeme he knew where she lived. [Filing No. 48-4, pp. 39-40 (Ohaeme Dep., p. 47, l. 23 - p. 48, l. 9)]. Ohaeme interpreted this comment as a threat and reported it to Burd and Richardson. [Filing No. 48-4, pp. 40-42 (Ohaeme Dep., p. 48, l. 18 - p. 50, l. 12)]. Both Burd and Richardson assured Ohaeme she was safe and Jones would not act on his comment. Filing No. 48-4, pp. 40-42 (Ohaeme Dep., p. 48, l. 18 - p. 50, l. 12)]. Jones did not make any additional comments to Ohaeme or do anything further. [Filing No. 48-4, p. 42 (Ohaeme Dep., p. 50, ll. 10-12)]. Neither the comments about lions and tigers in Nigeria nor the one-time comment about knowing where Ohaeme lived are related to Ohaeme sex or race, was not humiliating, and such comments did not interfere with her work. These incidents do not meet the severe and pervasive standard either. *See Paschall*, 28 F.4th at 814 – 16.

d.   Caleb Derbyshire.

There are several instances that Ohaeme complains of that involve Derbyshire. The first relates to the general conversation that Ohaeme and her coworkers were having about Nigeria. Ohaeme requested that her coworkers stop making comments and asking questions about poverty and lions and tigers in Nigeria, however she does not recall whether Derbyshire was present for that conversation. [Filing No. 48-4, p. 39 (Ohaeme Dep., p. 47, ll. 7-22)]. Sometime thereafter, Derbyshire made a single comment about poverty in Nigeria. [*Id.*] Ohaeme does not know if he was previously asked not to make these comments. In either event, such comment does not rise to

the level of severe and pervasive.

The next instance involving Derbyshire is the final unplugging of the computer at Ohaeme's desk. In anger, after Burd gave Ohaeme credit for a sale that Derbyshire believed should have been his, he unplugged the computer. [Filing No. 48-4, pp. 43-45, 139 (Ohaeme Dep., p. 51, l. 23 - p. 53, l. 21, p. 219, ll. 5-23)]; [Filing No. 48-6, p. 23 (Burd Dep., p. 32, ll. 4-13)]. Derbyshire then stormed out of the dealership and Burd told him not to return to work that day or the next. [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 24)]. When Derbyshire returned to work, Burd made Derbyshire apologize to Ohaeme. [Filing No. 48-6, p. 31 (Burd Dep., p. 40, ll. 19-21)]. Additionally, Burd addressed the entire sales team and explained this behavior would not be tolerated. [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 24)]. This incident was not repeated after this discipline. This is not severe and pervasive either.

Finally, Caleb also posted five Tik Tok videos depicting Ohaeme or mentioning Ohaeme. The first was a video of her taking her shoes and socks off at her desk. The second video was taken after Ohaeme fell in the snow. The third and fourth videos are of Ohaeme joking about a trade-in with a PA system. And the fifth video mentions Ohaeme because Derbyshire is defending her due to a racist comment made by an unknown third party on the first video. None of the first four videos relate to Ohaeme's sex or race. In the fifth video, Derbyshire, in addressing the racist third-party comment and defending Ohaeme, stating that while people "might hate her" it "*has nothing to do with her race*," "*race has nothing to do with it*," and that *she is a hard worker* (complementing Nigerians generally) and is the highest paid sales associate at Andy Mohr. [Filing No. 48-3, p. 3 (Cimera Aff. at ¶ 6)]; [Filing No. 48-3, p. 24 (Exhibit F-AndyMohr_000601)]. Once Ohaeme discovered these videos she reported this to Hurst who immediately took action. [Filing No. 48-2, p. 4 (Hurst Aff. at ¶ 13)]. Hurst requested Derbyshire take down the videos, issued him

a disciplinary warning, and required that Derbyshire write Ohaeme an apology. [*Id.*]. Derbyshire completed the requested actions, and this conduct did not occur again. [*Id.*]. This is not severe or pervasive to be actionable harassment.

All the instances that involve Derbyshire are: (1) one innocuous comment about poverty in Nigeria, (2) an instance of unplugging the computer at Ohaeme's desk, and (3) a couple Tik Tok videos that are innocent except for the use of foul language to refer to Ohaeme, which was done in her defense and complimenting Ohaeme and denying that his posting had anything to do with race. None of these instances have anything arguably to do with Ohaeme's race and only the final Tik Tok video has anything to do with her sex. The videos were not physically threatening, not materially humiliating, and did not interfere with her work. None of these instances are enough for Ohaeme to meet the burden of severe and pervasive. *See Weiss v. Coca–Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993) (finding that a male co-worker's conduct of several incidents of unwanted touching, attempts to kiss, placing "I love you" signs in the plaintiff's work area, and asking a female employee out on dates did not rise to the level of actionable harassment).

 e. Supervisors.

Ohaeme only alleges a few instances that involve supervisors. The first is an allegation that supervisors took away her customers and sales and gave them to other sales associates. [Filing No. 48-4, pp. 73, 75, 78 (Ohaeme Dep., p. 81, ll. 8-14, p. 83, ll. 3-18, p. 86, ll. 1-10)]. However, Ohaeme admits that on occasion she also received both split and house deals. [Filing No. 48-4, pp. 82-83 (Ohaeme Dep., p. 90, l. 13 - p. 91, l. 2)]. She also claims this occurred because she sold more cars than others, not because of her sex or race. [Filing No. 48-4, pp. 73, 75, 78 (Ohaeme Dep., p. 81, ll. 8-14, p. 83, ll. 3-18, p. 86, ll. 1-10)].

The second instance involving supervisors is the alleged comment about Ohaeme's success

made by both coworkers and supervisors. Ohaeme alleges these comments related to her being a woman in the car sales business, but she testified that Hurst clarified that he had never seen someone sell as many cars and make as much money as her, regardless of the person being a man or a woman. [Filing No. 48-4, pp. 69-70, 106 (Ohaeme Dep., p. 77, l. 18 - p. 78, l. 3, p. 139, l. 20)].

The third instance that Ohaeme alleges that involves a supervisor is when Richardson gave Ohaeme the nickname of "Nigerian Nightmare." This nickname was meant as a compliment and did not involve Ohaeme's sex or race; it was merely regarding her sales tactics. She appeared to enjoy the nickname and she never reported it as an issue. However, Hurst, on his own, asked Richardson to stop using this nickname, which he did. [Filing No. 48-5, p. 11 (Hurst Dep., p. 51, ll. 16-21)]; [Filing No. 48-2, p. 4 (Hurst Aff. at ¶ 11)]. None of this rises to the level of actionable severe and pervasive harassment on account of her sex or race.

*3. There Is No Basis For Employer Liability.*

Last, if Ohaeme can somehow satisfy the first three elements of her harassment claim—which she cannot—she must also prove "there is a basis for employer liability." *Paschall*, 28 F.4th at 813; *Kampmier*, 472 F.3d at 940. Because there are two different standards for liability, the coworker and supervisor allegations of harassment must be analyzed separately.

To establish employer liability for coworker harassment, Ohaeme must show that Andy Mohr was negligent in either discovering or remedying the harassment. *Paschall*, 28 F.4th at 813. ("An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees.") (cleaned up). Here, in every instance of coworker harassment described by Ohaeme, Andy Mohr took prompt and reasonable steps to ensure it did not occur again. In fact, the only repeated instance was the

computer unplugging. However, as soon as Ohaeme and Andy Mohr discovered who unplugged the computer, after significant effort to find out who was doing it, that person (Derbyshire) was disciplined and made to apologize, and it did not happen again. Andy Mohr took reasonable steps to discover and rectify the alleged harassing behavior, and is thus not liable under Title VII for any alleged coworker harassment. *See Trahanas*, 64 F.4th at 855.

Similarly, Andy Mohr is not liable for any alleged supervisor harassment. Ohaeme presents no evidence (and there is none) of any tangible employment action taken because of the alleged supervisor harassment. Neither her employment status nor benefits were changed, and she was not reassigned. *See Vance*, 570 U.S. at 431. She was never written up, suspended, subject to a reduction of pay, or disciplined. Because the supervisor harassment alleged by Ohaeme did not result in a tangible employment action, Andy Mohr thus establishes the *Faragher-Ellerth* defense. "Under the *Faragher-Ellerth* defense, an employer may avoid liability by showing: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." *Trahanas*, 64 F.4th at 854 (cleaned up). As explained in Part I.2.e, *supra*, Andy Mohr maintained both an anti-harassment and equal employment opportunity policy and provided anti-harassment training to its supervisors and employees. [Filing No. 48-6, pp. 6, 7 (Burd Dep., p. 15, ll. 5-21, p. 16, ll. 13-24)]; [Filing No. 48-1, p. 3 (Burd Aff. at ¶¶ 10-12); [Filing No. 48-1, pp. 9-11 (AndyMohr_000093-95)]. In Andy Mohr's Equal Employment Opportunity policies, there was a reporting system established. [Filing No. 48-1, pp. 9-11 (AndyMohr_000093-95)]. Ohaeme was aware and had access to these policies. [Filing No. 48-4, p. 83 (Ohaeme Dep., p. 91, ll. 3-18)]. Despite this knowledge, and even though she reported many instances of alleged coworker harassment, Ohaeme reported no instances of

supervisor harassment. Accordingly, Andy Mohr has established sufficient evidence to affirmatively defend against Ohaeme's claims of supervisor harassment. *See Trahanas*, 64 F.4th at 854 – 55.

## II.   Andy Mohr is Entitled to Summary Judgment on Ohaeme's Title VII Claims of Sex, Race, and National Origin Discrimination and Constructive Discharge.

Summary judgment is warranted on Ohaeme's Title VII claims of sex, race, and national origin discrimination claims because she was not subjected to any adverse employment action, let alone an adverse action because of her sex, race, or national origin. Nor can she point to her alleged constructive discharge to support an adverse action claim. The undisputed evidence – considered as a whole – does not support her late claim for constructive discharge. There is also no causal connection between Ohaeme's sex, race, and/or national origin to any condition of her employment with Andy Mohr or her voluntary resignation. Andy Mohr is thus entitled to summary judgment in its favor as a matter of law.

The legal standard used to evaluate a discrimination claim "'is simply whether the evidence,' considered as a whole, 'would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). In determining whether Ohaeme has met that burden, "the court considers all of the evidence cumulatively under a totality-of-the-evidence approach." *Freeman v. Molding Prods.*, No. 3:19-CV-70 RLM-MGG, 2020 WL 5076780, at *2 (N.D. Ind. Aug. 26, 2020), *aff'd*, 848 Fed. Appx. 196 (7th Cir. May 19, 2021) (internal quotations omitted). Therefore, to survive summary judgment, Ohaeme must present evidence that would permit a reasonable factfinder to conclude that she was *subjected to an adverse action* and that her sex, race and/or national origin *caused* the adverse employment actions

she allegedly suffered. *Daza v. State*, 331 F. Supp. 3d 810, 842 (S.D. Ind. 2018) (emphasis added).

"[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Under this test, courts evaluate whether plaintiffs: "(1) are members of a protected class; (2) performed reasonably on the job in accord with their employer['s] legitimate expectations; (3) were subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer." *Id.* at 895. If the plaintiff makes a *prima facie* showing, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). If the defendant articulates such a reason, the burden shifts back to the plaintiff to present evidence establishing a genuine dispute as to whether that reason was a pretext for discrimination. *Id.*

Courts "do not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *O'Regan v. Arb. Fs., Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (cleaned up). "It is well settled that an employer can make a mistake, or even act unfairly, while still not acting in a discriminatory fashion." *Hester v. Ind. State Dep't of Health*, No. 1:10-CV-1570-JMS-DML, 2012 WL 3779218, at *10 (S.D. Ind. Aug. 30, 2012). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). Title VII has recognized three categories of adverse actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and

experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Id.*

1. <u>*Ohaeme Was Not Subjected to an Adverse Employment Action.*</u>

One essential element of a Title VII discrimination claim is that Ohaeme was subjected to an adverse employment action. But here, the undisputed evidence reveals she was not. Ohaeme alleges a variety of conduct by her coworkers and supervisors, none of which (together or individually) constitute an adverse employment action. Ohaeme was not disciplined, written up, counselled, demoted, transferred, or terminated at any point during her employment. Additionally, Ohaeme's compensation and/or benefits were never adversely changed during her employment. Instead, she was given awards for her performance.

Further, as analyzed in Part I.2, *supra*, none of the actions alleged by Ohaeme rise to the level of severe and pervasive for purposes of a harassment claim, and thus are not enough to establish an adverse employment action. Like the Seventh Circuit's adverse employment action analysis in *Poullard v. McDonald*, which involved threatening statements, threat of disciplinary action, a letter of admonishment, racially offensive conduct, and allegations of improper compensation, analysis of Ohaeme's complaints does not reveal an adverse employment action. 829 F.3d 844, 856 – 59 (7th Cir. 2016); *see also Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 – 05 (7th Cir. 2001) (holding that continued harassment including remarks that indicated plaintiff "had to go" and needed to turn her key in were "too petty and tepid to constitute a material change in the terms and conditions of [plaintiff's] employment" to constitute an adverse employment action). Without an adverse action, Ohaeme cannot establish an essential element of her Title VII

discrimination claims, and Andy Mohr is entitled to judgment in its favor.

2. *Ohaeme Cannot Meet the Standard of Constructive Discharge.*

Ohaeme may attempt to manifest an adverse employment action by alleging she was constructively discharged. But her claims for constructive discharge fail to meet the very high burden required.[2]

To prove a claim for constructive discharge, Ohaeme must show "working conditions even more egregious than that required for a hostile work environment [or harassment] claim." *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022). Ohaeme must show "[s]he was forced to resign because [her] working conditions from the standpoint of a reasonable employee had become *unbearable*." *Overly v. KeyBank Nat'l Ass'n,* 662 F.3d 856, 866 (7th Cir. 2011) (emphasis added). And Ohaeme must show that seeking redress from Andy Mohr would have been futile. *See Stamey*, 37 F.4th at 1225. "[N]o constructive discharge occurs if the employer responds diligently [to an employee's complaints], and the employee quits despite a reasonable prospect that further complaints would lead to a resolution." *Id.*

The events Ohaeme alleges over two years amounted to: (i) eight instances of the computer at her desk being unplugged; (ii) one instance of a balloon with a penis drawn on it being moved from another employee's desk to her chair; (iii) a short lived complimentary nickname of "Nigerian Nightmare"; (iv) one Tik Tok video that referred to her using a profane name; (v) one instance of her being called a "black bitch" and a few instances where this name was repeated not to her but in passing; (vi) a few innocuous comments or questions about life in Nigeria; (vii) instances where Ohaeme believes comments were made regarding her success as a female; and (viii) instances where Ohaeme believes sales and customers were taken from her and given to other sales

---

[2] Also, as detailed in Part IV below, Ohaeme failed to even allege constructive discharge in her EEOC Charge, barring such claim.

associates for business reasons. These events occurred over a two-year period and involved a variety of sales associates and managers. And the individual (Derbyshire) that committed many of these instances was disciplined and required to apologize to Ohaeme.

In each instance that Ohaeme complained, Andy Mohr promptly addressed her complaints and took action to prevent any future complaints. When she talked about leaving, Andy Mohr even offered to transfer Ohaeme to another location. [Filing No. 48-4, pp. 52-53 (Ohaeme Dep., p. 60, l. 15 - p. 61, l. 24)]. But Ohaeme did not accept this offer, never returned to work, and resigned a month later, after filing her EEOC Charge. She simply "quit[] despite reasonable prospect that further complaints would lead to a resolution." *Stamey*, 37 F.4th at 1225. [Filing No. 48-4, p. 30 (Ohaeme Dep., p. 38, ll. 8-20)]; [Filing No. 48-1, p. 6 (Burd Aff. at ¶ 25)].

Ohaeme cannot meet the "severe and pervasive" standard required for her harassment claims, much less that the conduct she complains of meets the higher "unbearable" standard required for constructive discharge. *See Stamey*, 37 F.4th at 1225. Ohaeme's work environment and complaints are not near as egregious as the instances where constructive discharge has been upheld. *See id.* (upholding constructive discharge where the plaintiff experienced over one thousand discriminatory comments); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 – 90 (7th Cir. 2007) (reversing a denial of a constructive discharge claim where plaintiff complained repeatedly about sexual harassment from a supervisor and the employer took no action); *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006) (reversing summary judgment on a constructive discharge claim where a plaintiff was sexually touched on numerous occasions by her supervisor and fearful of additional physical assault). Consequently, Ohaeme fails to meet the high burden necessary for constructive discharge, and summary judgment is warranted in Andy Mohr's favor for failing to fulfill a necessary element of her sex, race, and national origin discrimination

claims.

3. *Similarly-Situated Employees Were Not Treated More Favorably Than Ohaeme.*

Further, based on the undisputed facts of this case, Ohaeme has no evidence that any of these incidents were caused by her sex, race, or national origin. Ohaeme cannot show that her sex, race, or national origin was the cause of anything. Ohaeme has not identified a single similarly-situated employee outside of her protected class who was treated more favorably. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (noting record must contain admissible evidence "that a similarly situated employee outside of [plaintiff's] protected class[] was treated more favorably."); *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 463 (7th Cir. 2014) ("A similarly situated employee is one whose performance, qualifications, and conduct are comparable in all material respects."). Ohaeme has not even claimed a similarly situated employee was treated more favorably. Accordingly, summary judgment is warranted in Andy Mohr's favor on Ohaeme's sex, race, and national origin discrimination claims on this basis as well.

4. *Andy Mohr Can Show a Legitimate Non-Discriminatory Reason for Its Actions in Response to Ohaeme's Complaints.*

Even if Ohaeme has evidence of a *prima facie* case of sex, race, or national origin discrimination (she does not), Andy Mohr demonstrates legitimate non-discriminatory reasons for the actions it took in response to Ohaeme's complaints. Ohaeme can point to no instance (and there is none) where the actions Andy Mohr took or did not take are related to her sex, race, or national origin. The undisputed evidence shows that Andy Mohr investigated her reported complaints, disciplined employees, and did everything reasonably possible to ensure Ohaeme's success as a sales associate. For instance, Andy Mohr withheld bonuses, told employees to apologize, disciplined employees, and told employees not to say or do certain things in the future, - - which instructions were all followed. Andy Mohr is entitled to summary judgment on Ohaeme's claims

of sex, race, and national origin discrimination and constructive discharge.

**III.    Andy Mohr is Entitled to Summary Judgment on Ohaeme's Section 1981 Claims.**

Similarly, summary judgment is warranted on Ohaeme's claims of harassment and constructive discharge alleged under Section 1981. Ohaeme cannot meet Title VII's lower burden of proof, and she certainly cannot meet the stricter but-for causation standard under Section 1981.

Section 1981 applies exclusively to Ohaeme's claims of racial discrimination—claims of discrimination based on sex or national origin are not actionable under Section 1981. *See Paschall*, 28 F.4th at 812 – 13; *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). The Seventh Circuit has made clear that "[t]he legal analysis for [racial] discrimination claims under Title VII and § 1981 is identical . . . ." *Smith*, 806 F.3d at 904. However, the causation standard is more stringent under Section 1981 than Title VII. Ohaeme has the burden of showing that her race was a "but-for cause" of the injury to successfully establish her Section 1981 claims. *Singmuongthong v. Bowen*, 77 F.4th 503, 507 (7th Cir. 2023). Section 1981's but-for causation standard represents a higher burden of proof than Title VII's "motivating factor" test. *See id*.

"To be actionable under § 1981, harassment must be: (1) based on *race*; (2) subjectively and objectively *hostile*; and (3) *sufficiently severe or pervasive* to interfere with an employee's ability to perform his assigned duties." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (emphasis added). Ohaeme must make a showing of actual discriminatory treatment, because merely proving a disparate impact will not support a Section 1981 claim. *See Franklin v. City of Evanston*, 384 F.3d 838, 848 (7th Cir. 2004). Ohaeme must also prove that the alleged discriminatory treatment was intentional. *See Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 312 (7th Cir. 1996). Like Title VII claims, "[i]n assessing whether the evidence would permit a reasonable factfinder to conclude that race caused the adverse employment action,

courts must evaluate all evidence as a whole, regardless of whether such evidence is characterized as direct or circumstantial." *Bowen*, 77 F.4th at 507.

1. _Ohaeme's Harassment and Constructive Discharge Claims Based on Sex and National Origin Are Not Cognizable Claims Under Section 1981._

Ohaeme claims in her Complaint she was harassed due to her sex in violation of Section 1981 and that she was constructively discharged due to her sex and national origin in violation of Section 1981. Yet, claims under Section 1981 are only viable if they involve race discrimination. Thus, Ohaeme's claims under Section 1981 for sex or national origin discrimination must be dismissed. *See Paschall*, 28 F.4th at 812 – 13; *Dandy*, 388 F.3d at 271.

2. _Ohaeme's Harassment Claim on the Basis of Race under Section 1981 Fails as a Matter of Law._

As demonstrated in Part I.1, *supra*, Ohaeme cannot establish a claim for harassment based on her race under Title VII. Because Ohaeme cannot prove that race was a motivating factor to any alleged incident of alleged harassment, Ohaeme cannot show but-for causation relative to these incidents. Additionally, for the reasons also set forth in Part I.1, *supra*, Ohaeme also cannot show that the alleged discrimination was intentional to succeed on a Section 1981 claim.

Even more fatal to her claim, Ohaeme cannot show that the alleged incidents were sufficiently severe or pervasive within the meaning of Title VII. *See* Part I.2, *supra*. Thus, she likewise cannot prove the alleged incidents were severe or pervasive for purposes of Section 1981, which utilizes an identical legal analysis. *Smith*, 806 F.3d at 904. In other words, switching the blender from Title VII to Section 1981 does not alter the analysis, and Ohaeme's attempted cobbling of isolated various instances of what she says were objectionable work events do not establish liability under Section 1981, just as it does not under Title VII. Andy Mohr is entitled to summary judgment on Ohaeme's Section 1981 claims of harassment.

3. *Ohaeme's Claims of Constructive Discharge under Section 1981 Fail as Matter of Law.*

Last, Ohaeme's claim of constructive discharge due to her race and engaging in protected activity under Section 1981 fail because she cannot meet the "unbearable" high burden required for constructive discharge explained in Part II.3, *supra*. Accordingly, summary judgment is also warranted on Ohaeme's claims of constructive discharge under Section 1981.

**IV.    Many of Ohaeme's Allegations are Broader than her EEOC Charge and Andy Mohr is Entitled to Summary Judgment on those Claims.**

To the extent that any claims remain, Andy Mohr is entitled to summary judgment on those Title VII claims that were not alleged in her EEOC Charge. Ohaeme alleges multiple instances that were not alleged within her EEOC Charge, - - the comments and/or questions about lions and tigers and poverty in Nigeria; the instances where Ohaeme believes comments were made regarding her success as a female; and that she was constructively discharged.

"[A] Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). An EEOC Charge is not jurisdictional, it is a condition precedent that a Title VII plaintiff must comply with. *Id.* Allowing a complaint or lawsuit to encompass new allegations that are outside the EEOC Charge frustrates the EEOC's investigatory and conciliatory role and deprives the charged party of notice of these allegations. *Id.* Only those claims set forth the EEOC Charge that are like or reasonably related to the allegations of the charge and growing out of such allegations may be raised in this lawsuit. *Id.*

While both Ohaeme's EEOC Charge (and her Complaint) allege claims of sex, race, and national origin discrimination, and claims of harassment based on her sex and race, neither her EEOC Charge nor her Complaint contain multiple incidents she claimed in her deposition and expected to be raised here. Specifically, neither her EEOC Charge nor her Complaint contain: (1) facts regarding comments and/or questions related to lions and tigers or poverty in Nigeria; (2)

facts regarding instances where Ohaeme believes comments were made regarding her success as a female; and her EEOC Charge fails to mention (3) any claim of constructive discharge. [Filing No. 48-4, pp. 85-86, 154-157 (Ohaeme Dep., p. 93, l. 6 – p. 94, l. 4, Exhibit G to Ohaeme Dep.)]; [Filing No. 1]. These allegations are distinctly different from the other allegations in her EEOC Charge and involve different individuals than the other allegations. *See, e.g.*, *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992) (explaining that the EEOC charge and complaint were not alike or reasonably related where employee's allegations to the EEOC contained only certain episodes of discrimination, and then employee sought judicial relief for different episodes of discrimination). These three specific allegations are not alike or reasonably related to Ohaeme's EEOC Charge, and thus those allegations may not be considered, and Andy Mohr is entitled to summary judgment on these allegations. *See Cheek*, 31 F.3d at 500 – 05.

## CONCLUSION

There are no genuine issues of material fact in this case. The designated, uncontroverted evidence shows that Ohaeme was not subjected to harassment based on her sex or race; Andy Mohr did not discriminate against Ohaeme based on her sex, race, or national origin; and Ohaeme was not constructively discharged due to her sex, race, or national origin. This Court should grant Andy Mohr's Motion for Summary Judgment.

Respectfully submitted,

By:     /s/ Scott S. Morrisson
Scott S. Morrisson, Atty. No. 11633-49
Elizabeth M. Roberson, Atty. No. 34097-64
KRIEG DeVAULT LLP
12800 North Meridian Street, Suite 300
Carmel, Indiana 46032-5407

*Attorneys for Defendant Andy Mohr Avon Nissan, Inc.*

KD_15184799_8.docx