UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THERSA OHAEME, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 1:23-cv-00181-JMS-KMB |
| | ) | |
| ANDY MOHR AVON NISSAN, | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

Plaintiff Thersa Ohaeme, a Black woman from Nigeria, worked at Defendant Andy Mohr Avon Nissan ("Andy Mohr") as a sales representative. Throughout her employment, she experienced several events at the hands of managers and co-workers that form the basis of this employment discrimination lawsuit. Ms. Ohaeme sued Andy Mohr, asserting several claims across both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981, including: gender and race discrimination in the form of harassment in violation of Title VII and § 1981; gender, race, and national origin discrimination in the form of disparate treatment in violation of Title VII; gender, race, and national origin discrimination in the form of constructive discharge in violation of Title VII and § 1981; and retaliation in the form of constructive discharge after reporting harassment in violation of Title VII and § 1981. Andy Mohr has filed a Motion for Summary Judgment, which is ripe for the Court's consideration. [Filing No. 48.]

## I.
### EVIDENTIARY ISSUES

The parties dispute whether evidence that Ms. Ohaeme relies upon in her response to Andy Morh's Motion for Summary Judgment is admissible. The Court addresses this dispute first as its

1

resolution informs the evidence the Court will consider in deciding the Motion for Summary Judgment.

In her response to Andy Mohr's Motion for Summary Judgment, Ms. Ohaeme relies on parts of deposition testimony from Patrick Hurst, the General Manager of Andy Mohr (White male) and Nick Burd, a sales manager at Andy Mohr (White male). [Filing No. 48-4 at 10; Filing No. 48-4 at 13; Filing No. 48-5 at 7-8; Filing No. 72 at 3; Filing No. 72 at 6; Filing No. 72 at 14-15.] The testimony includes answers to the following questions:

- "Do you believe calling someone a cunt is a form of sexual harassment?";

- "Do you believe that it is racial and sexual harassment to call someone a black bitch?"; and

- "Do you believe that the balloon incident that happened with male genitalia on it, do you believe that constituted sexual harassment?"

[Filing No. 64-4 at 60; Filing No. 64-4 at 72; Filing No. 64-5 at 37-38.] After each question, counsel for Andy Mohr made an "objection to form" before allowing the deponent to answer. [Filing No. 64-4 at 60; Filing No. 64-4 at 72; Filing No. 64-5 at 38.] The deponent answered each question with the response "yes." [Filing No. 64-4 at 60; Filing No. 64-4 at 72; Filing No. 64-5 at 38.] Ms. Ohaeme relies upon this testimony to show that these managers believed that several of the events that Ms. Ohaeme experienced were viewed as harassment by her managers. [*See* Filing No. 72 at 3; Filing No. 72 at 6; Filing No. 72 at 14-15.]

In its reply, Andy Mohr argues that the answers were all given "over counsel's objection" to form and therefore are inadmissible. [Filing No. 67 at 2.] Andy Mohr does not characterize the specific defect in the form of the question either during the deposition or in its reply, or develop an argument other than stating that it objected and the testimony is therefore inadmissible. The only statement that resembles an argument is a citation to a Northen District of Illinois case that

cites to a District of Columbia Circuit case with a parenthetical after the citation stating that "[l]ay legal conclusions are inadmissible [as] evidence." [Filing No. 67 at 2 ("*See CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assocs.*, 411 B.R. 591, 604 (N.D. Ill. 2009) (citing *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ('Lay legal conclusions are inadmissible [as] evidence.'))".]

Ms. Ohaeme filed a surreply to address Andy Mohr's objections. [Filing No. 70.] She argues that Andy Mohr's argument applies the wrong standard to her usage of the testimony and that the testimony is admissible as lay witness opinion testimony to show that, in their personal knowledge and experience relating to Andy Mohr's policies and training on discrimination and harassment, Mr. Hurst and Mr. Burd thought that certain events constituted harassment. [Filing No. 70.] She also argues that the testimony is crucial for understanding the workplace environment at Andy Mohr. [Filing No. 70.]

Despite not identifying the specific defect in the form of the question or developing a cogent argument, the Court understands Andy Mohr to be objecting to the form of the questions on the basis that they asked for a legal conclusion.[1] To be sure, a lay witness cannot testify as to legal conclusions. *See United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009). But here, the Court does not view Mr. Hurst's and Mr. Burd's testimony as to whether certain events amounted to actionable harassment to be legal conclusions, but instead views it as a statement of whether, in their own beliefs, certain events were harassing or disturbing in the workplace in the general sense. Because they are not offering a lay legal conclusion or testifying as an expert, their testimony must

---

[1] In the event that Andy Mohr's objections were based on something other than asking for legal conclusions, they are waived for the failure to develop them. *Anderson v. Street*, 104 F.4th 646, 654 n.3 (7th Cir. 2024) (citing *Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) (noting that courts "are not responsible for constructing the parties' arguments")).

only satisfy the elements set forth in Federal Rule of Evidence 701: that is, it must be rationally based on their own perceptions, helpful to the jury, and not based on scientific or other specialized knowledge.  Fed. R. Evid. 701.

Here, Mr. Hurst's and Mr. Burd's testimony meets these elements.  Both individuals had witnessed or handled the events alluded to in the questions in their positions as managers, meaning the answers are based on their own perceptions of what had occurred and what Ms. Ohaeme reported to them; it is helpful to the jury because it shows how the management at Andy Mohr viewed and assessed the events that Ms. Ohaeme complained about; and it is not based on scientific, technical, or specialized knowledge.  As the Court discusses below, Any Mohr management's response to Ms. Ohaeme's complaints of harassment is directly relevant to several of Ms. Ohaeme's claims, and a manager's belief as to whether an incident constitutes harassment would also be relevant.  The Court **OVERRULES** Andy Mohr's objection.

## II.
### SUMMARY JUDGMENT STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The

Court views the record in the light most favorable to the non-moving party, including giving that party the benefit of conflicting evidence, and draws all reasonable inferences in that party's favor. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022); *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.
### STATEMENT OF FACTS

The parties dispute much of the other's version of the facts. The disputes mainly revolve around both parties misrepresenting the record (extrapolating facts or statements beyond the appropriate context and beyond what the summary judgment standard affords each party) and Andy Mohr wholly ignoring Ms. Ohaeme's testimony regarding events when her testimony[2] conflicts with its version of events. Based on the parties' approach to summary judgment, the Court finds the Seventh Circuit's reminder from *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022), regarding the parties' "obligations with respect to the facts at the summary judgment stage" well warranted here:

> The [defendant (movant)] attempts to argue there is no genuine dispute of material fact, but in doing so it relies on [its] version of [a] key conversation with [plaintiff], even though [plaintiff] directly contradicted [defendant's] version in his deposition testimony. Our precedent demands more of the moving party at summary judgment. *See, e.g.*, *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) (discouraging moving party from presenting facts with a "loose allegiance" to the summary judgment standard); *Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014) (reversing summary judgment and criticizing moving party for ignoring conflicting evidence); *Payne v. Pauley*, 337 F.3d 767, 770-73 (7th Cir. 2003) (reversing summary judgment and explaining that both the moving and non-moving parties may rely on "self-serving" testimony); *see generally Anderson*, 477 U.S. at 255, 106 S. Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict."). Even if a judge might believe a moving party has more and/or better evidence in its favor, a motion for summary judgment does not authorize or invite the judge to weigh evidence and decide whose story is more credible or persuasive. As noted, we must consider the evidence in the light most favorable to the party opposing summary judgment, drawing all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255, 106 S. Ct. 2505; *Stewart*, 14 F.4th at 760.

---

[2] To be sure, deposition testimony, including "'self-serving' deposition testimony may satisfy a party's evidentiary burden on summary judgment" when the statements are "based on personal knowledge and . . . grounded in observation as opposed to mere speculation." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (emphasis omitted, quoting *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)); Fed. R. Civ. P. 56(c)(1)(A), (c)(4).

*Ziccarelli,* 35 F.4th at 1083.

With a firm reminder of the standard detailed above and that the Court's "assigned task . . . [is] to take the facts in the light most favorable to the non-moving party,"—here, Ms. Ohaeme— the Court sets forth the following Statement of Facts. *Stewart,* 14 F.4th at 760. The Court handles the parties' factual discrepancies below by accurately representing the record, by properly applying the summary judgment standard of review, and by noting in footnotes where the parties were misguided. The facts stated below are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.,* 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.    Andy Mohr's Anti-Harassment and Discrimination Policy and Training

Andy Mohr has an Employee Handbook that contains equal employment opportunity policies, anti-harassment policies, and non-retaliation policies, as well as the procedures for reporting violations of these policies. [Filing No. 48-1 at 3; Filing No. 48-1 at 9-11.] Violations can be reported to the employee's immediate supervisor, the Controller, the General Manager, or the President, and if the concern relates to the President's behavior, the procedure allows for a report to the CEO. [Filing No. 48-1 at 11.] Andy Mohr's managers also go through yearly anti-harassment training. [Filing No. 48-1 at 3; Filing No. 48-6 at 6-7.]

### B.    Ms. Ohaeme Interviews for a Job at Andy Mohr and Is Hired

Ms. Ohaeme is a Black female from Nigeria. [Filing No. 48-4 at 66; Filing No. 48-4 at 96; Filing No. 66.] In February 2020, she interviewed for a sales associate position with Andy Mohr. [Filing No. 48-4 at 8; Filing No. 48-4 at 12-14.] Ms. Ohaeme interviewed both with Mr. Hurst and Mr. Burd. [Filing No. 48-4 at 10; Filing No. 48-4 at 13; Filing No. 48-5 at 7-8.]

During her interview with Mr. Hurst, he told Ms. Ohaeme that he had never hired a female before. [Filing No. 48-4 at 13.] In her interview with Mr. Burd, he asked her if she "really wanted" the job because the job was typically a man's job.[3] [Filing No. 48-4 at 13.] Ms. Ohaeme was hired immediately after the interviews. [Filing No. 48-4 at 15; Filing No. 48-6 at 26.] Ms. Ohaeme received a copy of the Employee Handbook and had access to it throughout her employment. [Filing No. 48-1 at 3.]

### C.    Events During Ms. Ohaeme's Employment

Ms. Ohaeme was the only female sales associate except for a brief period during her employment. [Filing No. 48-1 at 3.] She "was a fantastic sales associate and quickly rose to the top of the sales associates by selling more cars than other sales associates." [Filing No. 48-1 at 4] (statement from Mr. Burd's affidavit); *see* Filing No. 66 at 1.] However, she "was told, on a monthly basis, [that] 'selling cars is not women's work' by co-workers and managers." [Filing No. 66 at 2.] Several other events which are at the center of this lawsuit took place during her time at Andy Mohr.

#### 1.    Four Instances of an Unplugged Computer

In May 2020, Ms. Ohaeme began experiencing issues with the cables connected to the computer at her desk becoming unplugged. [Filing No. 48-4 at 34.] The first time it happened, Ms. Ohaeme thought that the cleaners may have been at fault. [Filing No. 48-4 at 34.] But about two weeks later, it happened again, and this time, it occurred during the day, so she no longer

---

[3] As an example of Andy Mohr's ill-advised summary judgment approach, it argues and puts forth testimony from both Mr. Hurst and Mr. Burd that these comments were never made to Ms. Ohaeme. [*See* Filing No. 51 at 3; Filing No. 67 at 2.] Nevertheless, Ms. Ohaeme's evidence to the contrary is admissible evidence, and the Court discharges its responsibility "to take the facts in the light most favorable" to Ms. Ohaeme as the non-moving party and does "not weigh conflicting evidence resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart*, 14 F.4th at 760 (citation omitted).

thought it could have been the cleaners.  [Filing No. 48-4 at 34.]  It was particularly troublesome for Ms. Ohaeme the second time it occurred because she had sold three cars that day and was doing paperwork for a sale when her computer was unplugged.  [Filing No. 48-4 at 35.]  She immediately reported the second occurrence to Mr. Hurst and told him that she thought someone was purposefully unplugging her computer.  [Filing No. 48-4 at 35.]  Mr. Hurst printed Ms. Ohaeme's paperwork for her to allow her to finish with her customer.  [Filing No. 48-4 at 35.]

About a month later, it happened for the third time, again on a day where she had sold several cars.  [Filing No. 48-4 at 35-36.]  Mr. Hurst was not at work, so Ms. Ohaeme reported it to Mr. Burd.  [Filing No. 48-4 at 36.]  Mr. Burd told Ms. Ohaeme that he would handle it and helped her print the paperwork she needed.  [Filing No. 48-4 at 36.]  At this point in time, Ms. Ohaeme did not know who was unplugging her computer but thought it had something to do with trying to impede her work for the day.  [Filing No. 48-4 at 36.]

In late 2020, it happened for the fourth time.  [Filing No. 48-2 at 3; Filing No. 48-4 at 37.]  Ms. Ohaeme reported it to Mr. Hurst, who got "very mad," called a meeting of the sales team, and told everyone that the behavior needed to stop and that he was going to put cameras in the sales bullpen to deter the conduct.  [Filing No. 48-4 at 36-37.]

### 2.     *Customer and Sales Assignments*

Andy Mohr has a policy that two sales associates should not work with the same customer on the same day.  [Filing No. 64-3 at 83-86; Filing No. 64-3 at 206.]  Andy Mohr also has a policy whereby a return customer stays assigned to the sales associate that the customer first worked with unless that sales associate is not working on the day that the customer returns.  [Filing No. 64-3 at 83-86.]  When a customer returns and the assigned sales associate for that customer is not at work, management reassigns the customer to another sales associate.  [Filing No. 48-5 at 16; Filing No.

64-3 at 83-86.] If a sale is completed by the reassigned sales associate, the sale is deemed a "split deal" whereby the two sales associates split the commission from the sale. [Filing No. 48-5 at 16.] Sales associates are paid on a commission basis, so splitting a commission or having customers reassigned results in lost pay. [*See* Filing No. 64-3 at 20-21.]

On one occasion, a split deal was taken away from Ms. Ohaeme in contravention of Andy Mohr's normal policies. [Filing No. 64-3 at 205-06.] Specifically, in June 2020, she was assigned a customer previously assigned to James Starrett, a White male sales associate who was not at work that day. [Filing No. 64-3 at 204-06; Filing No. 64-4 15-18; Filing No. 64-4 at 31; Filing No. 64-4 at 36.] Despite the policy against two sales associates speaking with a customer on the same day and the concept of a split deal when the first sales associate is not at work, Aaron Richardson, a White male sales manager, called Mr. Starrett to come into work and, after Ms. Ohaeme was already helping the customer, Mr. Starrett took over. [Filing No. 64-3 at 205-07.] Mr. Starrett received full credit for the sale—it was not counted as a split deal. [Filing No. 64-3 at 206-07.] Ms. Ohaeme reported this to Mr. Hurst, who told her "[h]onestly if you only spent five minutes with them[,] it's probably not worth the fight. Go sell something to someone else." [Filing No. 64-3 at 205.] Ms. Ohaeme was never called while at home to help a customer assigned to her. [Filing No. 64-3 at 84-85.]

Split deals were also forced upon Ms. Ohaeme while she was in the dealership working. [*See* Filing No. 64-3 at 86-88.] On two occasions when Ms. Ohaeme had prior customers come in while she was in the dealership working (even when scheduled by appointment), Mr. Burd reassigned the customers to male sales associates, despite Ms. Ohaeme's availability and relationship with the customer, and entered the sales as split deals between Ms. Ohaeme and the other associate. [Filing No. 64-3 at 86-88.] Ms. Ohaeme told Mr. Burd that she was there and

able to help the customers who she was previously assigned to help, but he told her that she had already sold enough cars.  [Filing No. 64-3 at 86-87; Filing No. 64-3 at 91.]

On another occasion, Ms. Ohaeme had a customer return to buy another car from her and the customer specifically asked for Ms. Ohaeme.  [Filing No. 64-3 at 89-90.]  Another sales associate, Vincent Mitchell, a Black male sales associate, falsely told the customer that Ms. Ohaeme was not in that day and took the customer as his own.  [Filing No. 48-5 at 7; Filing No. 64-3 at 89-90.]  Ms. Ohaeme walked by shortly after and the customer said to her, "that's my girl. I thought they said you were not in today."  [Filing No. 64-3 at 89-90.]  Ms. Ohaeme was surprised by this and told the customer that Mr. Vincent would take care of her, abiding by the policy that two sales associates do not talk to a customer on the same day.  [Filing No. 64-3 at 90.]  She immediately told management, who normally would have asked the second sales associate why they took the other's customer and would let the original sales associate return to helping the customer.  [Filing No. 64-3 at 90.]  However, on this occasion, Ms. Ohaeme was told to "just leave it alone [because] [Mr.] Vincent [was] already attending" to the customer.  [Filing No. 64-3 at 90.]  Ms. Ohaeme figured it would then be a split deal between herself and Mr. Mitchell under Andy Mohr's policies, but management did not enter the sale as a split deal and instead gave full commission to Mr. Mitchell.  [Filing No. 64-3 at 90.]

3.    *Comments About Nigeria, Knowing Where Ms. Ohaeme Lives, and Working in a Man's World*

In late 2020 or early 2021, Ms. Ohaeme's co-workers would ask her about her life in Nigeria.  [Filing No. 48-4 at 37-40.]  They asked if she had moved to America "because Nigeria is full of poverty" and if she had "lions and tigers in [her] houses" in Nigeria.  [Filing No. 48-4 at 37-38.]  Most of the time when the co-workers asked these questions or made similar comments about Nigeria, it was in front of the managers, and everyone including the managers would laugh.  [Filing

No. 48-4 at 38.] Each time a co-worker made a comment or asked about Nigeria, Ms. Ohaeme would ask them to stop because she found it hurtful and not funny. [Filing No. 48-4 at 39.]

On one occasion, Ms. Ohaeme told Dajuan Jones, a Black male sales associate, to stop making such comments, which turned into an argument whereby Mr. Jones told Ms. Ohaeme that he knew where she lived. [Filing No. 48-4 at 40; Filing No. 48-5 at 7.] Ms. Ohaeme interpreted the comment as a threat. [Filing No. 48-4 at 40-42.] She immediately reported it to Mr. Burd and Mr. Richardson, who told Ms. Ohaeme that Mr. Jones cannot do anything to her and to just forget about it. [Filing No. 48-4 at 40-42.]

Also throughout her employment, Ms. Ohaeme's co-workers would tell her that "this is a man's world in the car business . . . not a women's world," and Mr. Hurst told her that he had never seen someone so successful at selling cars, especially not a woman. [Filing No. 48-4 at 69-70.]

### 4.    *Ms. Ohaeme's Computer Is Unplugged for the Fifth Time*

In March 2021, Ms. Ohaeme's computer was unplugged for the fifth time, and she reported the occurrence to Mr. Richardson because Mr. Hurst was not in the office. [Filing No. 48-4 at 42-43.] Mr. Richardson said he was "going to deal with it." [Filing No. 48-4 at 42-43.]

### 5.    *A Balloon with a Penis Drawn on It Is Placed on Ms. Ohaeme's Desk*

On May 8, 2021, Ms. Ohaeme was walking to her desk to use her computer to print paperwork for a sale when she discovered that a balloon with a penis drawn on it had been placed on her desk where everyone could see it. [Filing No. 48-4 at 32-33.] Ms. Ohaeme was shocked by the balloon and was heartbroken to see it. [Filing No. 48-4 at 32.] She immediately informed Mr. Hurst, who told her to place the balloon in his office and shut the door and that he would handle it. [Filing No. 48-4 at 32; Filing No. 48-4 at 131-32.]

The next day, Mr. Hurst met with the entire sales team and told them that the incident was unacceptable. [Filing No. 48-5 at 8.] He asked Ms. Ohaeme not to be present at that meeting. [Filing No. 48-4 at 93-94; Filing No. 48-5 at 8.] No one admitted to placing the balloon on Ms. Ohaeme's desk. [Filing No. 48-5 at 8-9.] Mr. Hurst also individually met with Mr. Jones, Myron Jackson, and Mr. Mitchell, all Black male sales associates, for about five minutes each because he thought they might know what was going on regarding the balloon, but he was unable to glean any information from them. [Filing No. 48-2 at 3; Filing No. 48-5 at 8-9.] Because no one owned up to the incident, Mr. Hurst took away that week's SPIFF[4] incentive, which was a pool of money (ranging from $3,000 - $6,000) that would be split among sales associates who sold cars that contributed to a certain sales goal if that goal was met. [Filing No. 48-4 at 95; Filing No. 48-5 at 8; Filing No. 48-6 at 15-16.]

The next day, Ms. Ohaeme overheard Mr. Jackson telling other sales associates that Caleb Derbyshire, a multi-racial male sales associate, was responsible for drawing on the balloon and placing it on her desk. [Filing No. 48-2 at 3; Filing No. 48-4 at 33; Filing No. 48-4 at 97; Filing No. 48-5 at 7; *see* Filing No. 48-5 at 13.] Ms. Ohaeme told Mr. Hurst what she had heard, and Mr. Hurst told her that he did not have evidence that Mr. Derbyshire was the culprit. [Filing No. 48-4 at 33.]

### 6.    *Ms. Ohaeme Is Called a "Black Bitch" by Co-workers*

In the summer of 2021, Mr. Jackson called Ms. Ohaeme a "Black bitch" to her face during a disagreement at work. [Filing No. 48-4 at 54-55; Filing No. 48-5 at 7.] Ms. Ohaeme immediately reported it to Mr. Hurst, who had a conversation with Mr. Jackson and told him that his outburst cannot happen again and made him apologize. [Filing No. 48-4 at 55; Filing No. 48-6 at 21-22.]

---

[4] The parties do not define this acronym.

After Mr. Jackson's use of the name, the male sales associates including Mr. Jackson used the term to refer to Ms. Ohaeme as she walked by on four different occasions over four months, and she reported three of the occasions to either Mr. Burd or Mr. Richardson.  [Filing No. 48-2 at 3; Filing No. 48-4 at 55-57; Filing No. 48-4 at 113-14; Filing No. 66 at 2.]   After the fourth occurrence, Ms. Ohaeme told Mr. Hurst and he laughed at her.  [Filing No. 48-4 at 114.]  Mr. Hurst later "had a group discussion" with Mr. Jackson, Mr. Derbyshire, Mr. Mitchell, and another sales associate, David Johnson, about their behavior and gave them a verbal warning.  [Filing No. 48-2 at 3.]  The epithet was not used again.  [Filing No. 64-3 at 186.]

### 7.    *Mr. Richardson Refers to Ms. Ohaeme as "Nigerian Nightmare"*

In September 2021 in a Saturday morning meeting with the entire sales team, all of management, and other staff members, Mr. Richardson told Ms. Ohaeme that he had a new name for her and wrote the name "Nigerian Nightmare" on the white board in bold in lieu of her name in the list of sales associates.  [Filing No. 48-4 at 58-59.]  Ms. Ohaeme did not like the name and told Mr. Hurst, who was in the meeting, that she did not like it.[5]  [Filing No. 48-4 at 59-60.]  Mr. Hurst told her to tell that to Mr. Richardson.  [Filing No. 48-4 at 59-60.]  The name stayed on the

---

[5] As an example of Ms. Ohaeme misrepresenting the record, she asserted without any citation to the testimony of Mr. Hurst, that "[Mr.] Hurst testified that he thought [the nickname] was funny." [Filing No. 72 at 10 (citing 64-3 at 68 (Ms. Ohaeme's testimony—not Mr. Hurst's testimony)).] Despite the fact that the Court need only consider cited material and need not "scour the record" for evidence that is potentially relevant, *Grant*, 870 F.3d at 572-73, the Court read the entire testimony of Mr. Hurst to double check, only to find that Mr. Hurst was never asked if he thought the nickname was funny and never testified to finding the nickname funny.  [Filing No. 64-4.] Quite the opposite actually, Mr. Hurst clearly testified that he did not laugh about it.  [Filing No. 64-4 at 52-53.]  As an example of Andy Mohr ignoring conflicting evidence and misrepresenting the record, it asserts that Ms. Ohaeme "appeared to enjoy the nickname and she never reported it as an issue."  [Filing No. 51 at 24.]  The Court credits Ms. Ohaeme's testimony that she did not find the name funny or like it, [Filing No. 48-4 at 59-60], as required by the summary judgment standard, and the Court notes that she did indeed report it to Mr. Hurst, [Filing No. 48-4 at 59-60].

white board for several days.  [Filing No. 48-4 at 60.]  Ms. Ohaeme's co-workers[6] then began to call her the Nigerian Nightmare on a weekly basis, which she reported to Eric Spersrud, Andy Mohr's Director of Operations, a few weeks before she resigned.  [Filing No. 64-3 at 70; Filing No. 66 at 2.]

### 8.    Ms. Ohaeme's Computer Is Unplugged for the Sixth Time

In late 2021, Ms. Ohaeme's computer was unplugged for the sixth time, and she reported it to Mr. Hurst.  [Filing No. 48-4 at 42-43.]  She reminded Mr. Hurst that, over a year ago, he said he was going to put cameras in the sales bullpen.  [Filing No. 48-4 at 43.]  Mr. Hurst told Ms. Ohaeme that he had not yet found someone to put the cameras in the bullpen and that he did not know who was unplugging her computer.  [Filing No. 48-4 at 43.]

### 9.    Ms. Ohaeme Witnesses Mr. Derbyshire Unplug Her Computer

In February 2022, Ms. Ohaeme was helping a customer towards the end of the day after she had already sold several cars that day when Mr. Derbyshire thought that he should have been helping the customer instead.  [Filing No. 48-4 at 44-45.]  The next day, Ms. Ohaeme witnessed Mr. Derbyshire unplug her computer, which tallied the seventh occurrence.  [Filing No. 48-4 at 43-44.]  As she watched him, he immediately left the building, got into his car, and drove off.  [Filing No. 48-4 at 45.]  Ms. Ohaeme immediately called Mr. Burd to tell him what happened.  [Filing No. 48-4 at 45.]  Mr. Burd called Mr. Derbyshire and told him not to return to work that day or the next day and told him that upon his return, he was required to apologize to Ms. Ohaeme.

---

[6] Ms. Ohaeme asserts that Mr. Richardson "called her the nickname on at least three separate occasions."  [Filing No. 72 at 18.]  But she does not provide a citation to where this evidence is located in the record, [Filing No. 72 at 18], and the Court need only consider the cited materials and need not "scour the record," *Grant*, 870 F.3d at 572-73.  Nevertheless, the Court did its best to locate such evidence, but its efforts proved unfruitful.  Therefore, the Court does not credit Ms. Ohaeme's unsupported assertion.

[Filing No. 48-1 at 6.]  Mr. Derbyshire admitted to Mr. Burd that he unplugged her computer but was not written up or investigated further.  [Filing No. 48-5 at 14; Filing No. 48-6 at 23.]

10.    *Ms. Ohaeme Discovers Mr. Derbyshire's TikTok Videos of Her*

The day after Mr. Derbyshire unplugged Ms. Ohaeme's computer for the seventh time, Ms. Ohaeme found out from an employee who was not in sales that Mr. Derbyshire had posted videos of her on his TikTok account.  [Filing No. 48-4 at 45-47.]  Ms. Ohaeme accessed TikTok, found Mr. Derbyshire's account, and saw a total of five videos that he had posted of her or about her, including one where he referred to her in a comment as "the biggest cunt" at Andy Mohr.  [Filing No. 48-3 at 24; Filing No. 48-4 at 47.]

Ms. Ohaeme immediately showed Mr. Hurst Mr. Derbyshire's TikTok account, and Mr. Hurst said that he would handle it.  [Filing No. 48-4 at 47.]  Mr. Hurst called Mr. Derbyshire into his office.  [Filing No. 48-4 at 47-49.]  Ms. Ohaeme did not know what occurred in the meeting between Mr. Hurst and Mr. Derbyshire, but the videos were deleted from Mr. Derbyshire's account, and he received a warning (his first) for posting things detrimental to the dealership and remained employed.  [Filing No. 48-4 at 48-50; Filing No. 64-4 at 65-71.]

11.    *Ms. Ohaeme Meets with Management*

After Mr. Hurst's meeting with Mr. Derbyshire, Ms. Ohaeme met with Mr. Hurst and Mr. Spersrud "to discuss the harassment and discrimination that [she] had been suffering at work" and told them that she was not sure that she wanted to continue working at Andy Mohr because of the treatment she had been receiving the past two years.  [Filing No. 64-3 at 60-61; Filing No. 64-12 at 1.]  They "promised [her] that the harassment would stop."  [Filing No. 64-12 at 1.]  They also offered to move Ms. Ohaeme to another store without specifying which store, which she declined because she had already built a great customer background for herself at Andy Mohr, knew the

Nissan brand very well, and did not want to start over, especially at a smaller store with a different brand. [Filing No. 64-3 at 61-62.] Ms. Ohaeme then went home to think about the situation. [Filing No. 64-3 at 60-61.]

12.    *Ms. Ohaeme Meets Again with Mr. Hurst the Next Day*

Ms. Ohaeme returned to work the next day and met again with Mr. Hurst. [Filing No. 64-12 at 1.] Ms. Ohaeme asked Mr. Hurst if anything would change because he had been telling her that the harassment would stop for two years now, "but nothing ever stopped." [Filing No. 64-3 at 70-71.] Mr. Hurst then told Ms. Ohaeme that she was the only one who was being harassed and whose computer was getting unplugged and was the only one who was making complaints and that he was tired of listening to it. [Filing No. 64-3 at 70-71.] He told her that if the harassment and complaints continued to happen, he would have to let her go. [Filing No. 64-3 at 70-72.] Ms. Ohaeme asked Mr. Hurst if he was threatening her, to which he responded no, "but I just have to let you know that, if it keeps going on, I just have to let you go." [Filing No. 64-3 at 71-72.] Ms. Ohaeme interpreted it as a threat that if she kept complaining about harassment that was not being successfully addressed, then he would fire her.[7] [Filing No. 64-3 at 72.] Andy Mohr's management then offered for Ms. Ohaeme to take some time off to "think about what [was] going on." [Filing

---

[7] As another example of Andy Mohr misrepresenting the record, it asserts multiple times that "[Ms. Ohaeme's] testimony was that she knew it was not a threat to her employment." [Filing No. 67 at 16 (emphasis in original); Filing No. 20 n.5 ("[Ms.] Ohaeme actually testified [that] she did not think [Mr.] Hurst's comments were a threat.") (citing Filing No. 48-4 at 62-63) (emphasis in original).] Ms. Ohaeme's testimony, however, is very clear that she did indeed interpret Mr. Hurst's comments as a threat, despite him saying they were not. [Filing No. 48-4 at 62-63 (In answering the question, "So but he said he wasn't threatening you?", Ms. Ohaeme stated, "He used the word he wasn't, but to me, that's a threat that, I just have to let you go.").] Andy Mohr also argues that "[s]he falsely claims [Mr.] Hurst threatened to terminate her employment." [Filing No. 67 at 16.] The Court again points Andy Mohr to the Seventh Circuit's guidance in *Ziccarelli*, 35 F.4th at 1083, regarding the Court's obligation on summary judgment with respect to conflicting evidence.

No. 64-3 at 39.]  Ms. Ohaeme took two weeks off to think about what she wanted to do.  [Filing

No. 64-3 at 39.]

### D.    Ms. Ohaeme Files an EEOC Charge

On March 8, 2022, during her time off, Ms. Ohaeme filed a Charge of Discrimination with

the Equal Employment Opportunity Commission ("EEOC"), stating:

> I am a Nigerian woman.  On February 26, 2020, I began working for Andy Mohr – Avon Nissan as a sales professional.  I am the only Nigerian (Black) woman that works as a sales professional.  I performed my job well.  I consistently received the most sales of anyone at the dealership.
>
> As soon as I began working at Andy Mohr, I began to experience harassment.  While working co-workers began to unplug my computer to impede me from doing my job.  My computer was the only computer that was being unplugged.  I informed management and they did nothing.
>
> In May 2021, a balloon with a penis drawn on it was placed at my desk.  I informed management and management said they didn't know who did it so nothing could be done.  I then informed management that a co-worker, Caleb, was the one who placed the balloon on my chair.  However, management did nothing.
>
> While working at Andy Mohr, I began to be called "Nigerian Nightmare" and "Black Bitch".  I informed management that I was scared for my safety and the safety of my personal possessions.  Again, management did nothing.
>
> My co-worker, Caleb, began posting videos and pictures of me to his personal tiktok account.  In the videos he called me a "cunt" and posted videos of me falling.  I informed management and management only told him to take it down and apologize.
>
> Management would give my customers and sales to male co-workers because they said I have enough sales.  However, management never gave me any sales.
>
> In January 2022, I had another talk with management about the harassment and hostile work environment.  At first, I was told that they would make sure the harassment would stop.  However, when I had a follow-up conversation with the GM, he informed me that he was tired of me complaining and that I was the only person complaining so if I complained again he would need to fire me.
>
> I believe I was discriminated against in violation of Title VII of the Civil Rights Act.

[Filing No. 64-6 at 1-2.]   In the "discrimination based on" box, Ms. Ohaeme checked the boxes "Race," "Sex," and "National Origin."  [Filing No. 64-6 at 1 (emphases omitted).]

### E.    Ms. Ohaeme Resigns

On March 14, 2022, Ms. Ohaeme was still using her time off when she texted her resignation to Mr. Hurst.  [Filing No. 48-2 at 5; Filing No. 64-3 at 39.]  Ms. Ohaeme felt that her resignation was not voluntary in light of Mr. Hurst's statement that if the complaints regarding harassment continued, then she would be let go.  [Filing No. 64-3 at 108-09; Filing No. 66 at 3.] Ms. Ohaeme's last day of actual work was on March 2, 2022.  [Filing No. 64-7 at 4.]

### F.    This Lawsuit

On January 29, 2023, Ms. Ohaeme filed this lawsuit asserting several claims against Andy Mohr:

- Race discrimination in the form of harassment in violation of Title VII and § 1981;

- Gender discrimination in the form of harassment in violation of Title VII and § 1981;

- Race discrimination in the form of disparate treatment in violation of Title VII;

- Gender discrimination in the form of disparate treatment in violation of Title VII;

- National origin discrimination in the form of disparate treatment in violation of Title VII;

- Race discrimination in the form of constructive discharge in violation of Title VII and § 1981;

- Gender discrimination in the form of constructive discharge in violation of Title VII and § 1981;

- National origin discrimination in the form of constructive discharge in violation of Title VII and § 1981; and

- Retaliation in the form of constructive discharge after reporting harassment in violation of Title VII and § 1981.

[Filing No. 1; Filing No. 39 (Ms. Ohaeme's Statement of Claims).]  Ms. Ohaeme seeks back pay, lost benefits, compensatory damages for future pecuniary loss, and costs.  [Filing No. 1 at 5-6.]

## IV.
### DISCUSSION

Before reaching the merits, the Court notes that several of the claims and arguments in this case overlap extensively, resulting in the incorporation of cross-referenced arguments elsewhere in the parties' briefs.  The Court does its best to accurately set forth all of the parties' arguments. Further, due to the number of claims and protected characteristics at issue, the parties' briefs mostly clump all of the protected characteristics together without a more specific delineation of evidence supporting or contradicting each protected characteristic claim.  The Court does it best to disaggregate the claims by theory and protected characteristic where appropriate to achieve a fair evaluation of this case.

### A.    Exhaustion of EEOC Remedies

The Court begins with addressing Andy Mohr's argument that Ms. Ohaeme did not exhaust her administrative remedies under Title VII as to: (1) "facts regarding comments and/or questions related to lions and tigers or poverty in Nigeria"; (2) "facts regarding instances where [Ms.] Ohaeme believes comments were made regarding her success as a female"; (3) "any claim of constructive discharge"; and (4) a retaliation claim, and so they cannot be considered here.  [Filing No. 51 at 34-35; Filing No. 67 at 19.]  Andy Mohr argues that "[a]llowing a complaint or lawsuit to encompass new allegations that are outside the EEOC Charge frustrates the EEOC's investigatory and conciliatory role and deprives the charged party of notice of these allegations." [Filing No. 51 at 34 (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).]  It

argues that the first three allegations listed above are not included in Ms. Ohaeme's EEOC Charge, are not like or reasonably related to the allegations in the EEOC Charge, and involve different individuals than the other allegations in her EEOC Charge. [Filing No. 51 at 34-35.] As to retaliation, it argues that such a claim was not alleged and that Ms. Ohaeme "did not mark the box for retaliation." [Filing No. 67 at 19.]

Ms. Ohaeme argues that she sufficiently exhausted her remedies and that all of the allegations in her Complaint are within the scope of the EEOC Charge. [Filing No. 72 at 27-30.] She asserts that "[a] Title VII Plaintiff need not allege in an EEOC Charge each and every fact that combines to form the basis of each claim in her complaint." [Filing No. 72 at 28 (citing *Delgado v. Merit Sys. Prot. Bd.*, 880 F.3d 913, 926 (7th Cir. 2018)).] Ms. Ohaeme argues that her EEOC Charge and her Complaint refer to the same individuals and same set of facts and that her EEOC Charge was "sufficient for the EEOC to inquire and investigate." [Filing No. 72 at 28-30.] Specifically related to constructive discharge, Ms. Ohaeme argues that her EEOC Charge contained the allegation that she faced termination if she continued to complain about harassment and highlights that Andy Mohr's "position statement informed the EEOC of her resignation," so that the EEOC "had notice and was able to investigate the claim" of constructive discharge. [Filing No. 72 at 29-30.]

In reply, Andy Mohr focuses on constructive discharge. [Filing No. 76.] It asserts that Ms. Ohaeme's EEOC Charge "fails to mention constructive discharge" and that "there are no allegations in the [EEOC Charge] that are like or reasonably related to a claim of constructive discharge." [Filing No. 76 at 2-3.] It notes that such a claim could not have been raised anyway "because [Ms. Ohaeme] filed her EEOC Charge on March 9, 2022 *before* she resigned on March

14, 2022,"[8] and highlights that she did not file an amended charge after March 14, 2022.  [Filing No. 76 at 2 (citations omitted, emphasis in original).]

Under Title VII, a plaintiff cannot bring claims in a lawsuit that were not included within the scope of her EEOC charge.  *Hambrick v. Kijakazi*, 79 F.4th 835, 841 (7th Cir. 2023); *Cheek*, 31 F.3d at 500.  Courts construe the scope of an EEOC charge liberally.  *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015) (citations omitted); *see also McHale v. McDonough*, 41 F.4th 866, 870 (7th Cir. 2022).  Accordingly, "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint."  *Cheek*, 31 F.3d at 500.  Rather, a claim is exhausted if it is (1) "like or reasonably related to the EEOC charge, and [(2)] can be reasonably expected to grow out of an EEOC investigation of the charges."  *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 565 (7th Cir. 2019) (quotations and citation omitted).  "To satisfy the first prong, claims must at least describe the same conduct and implicate the same individuals."  *McHale*, 41 F.4th at 870 (citation omitted).  "The second prong requires speculation as to what the EEOC might or might not discover in the course of an investigation."  *Id.* (quotations and citation omitted).  "The primary purpose of the EEOC charge requirement is twofold: it gives the EEOC and the employer a chance to settle the dispute, and it gives the employer notice of the employee's grievances."  *Huri*, 804 F.3d at 831 (citing *Cheek*, 31 F.3d at 500).  The Court analyzes whether this standard is met for each of the points raised by Andy Mohr.

     1.     *"Facts Regarding Comments and/or Questions Related to Lions and Tigers or Poverty in Nigeria"*

Ms. Ohaeme's EEOC Charge alleges that she was discriminated on the basis of her national

---

[8] Ms. Ohaeme filed her EEOC Charge on March 8, 2022.  [Filing No. 64-6.]

origin ("Nigerian (Black)"), that she was the only "Nigerian (Black)" sales professional employed at Andy Mohr, and that how she was called "Nigerian Nightmare," yet "management did nothing" after her complaints regarding the nickname.  [Filing No. 64-6 at 1.]  The EEOC Charge also makes clear that Ms. Ohaeme viewed the nickname and several other events to be "harassment and [a] hostile work environment."  [Filing No. 64-6 at 1-2.]  Ms. Ohaeme's Complaint, in turn, alleges the same—in fact, in almost identical language—and asserts several claims for discriminatory treatment based on national origin.  [Filing No. 1 at 2-6.]

Andy Mohr's challenge, however, is not waged against Ms. Ohaeme's *claims* of national-origin-based discrimination or the underlying theories, and rightfully so because such claims were fairly presented in her EEOC Charge, meet the test described above, and gave adequate notice to Andy Mohr of Ms. Ohaeme's grievances.  Rather, Andy Mohr challenges additional *facts* that became known through discovery that she may use to support those claims.  This challenge is unpersuasive and crafts a higher standard than the law requires.  The law is clear that "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint."  *Cheek*, 31 F.3d at 500.  And to the extent that Andy Mohr is challenging the sufficiency of Ms. Ohaeme's Complaint because it does not include all the evidence upon which she may rely at trial or in opposing summary judgment, this argument is also unpersuasive and incongruent with the law.  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) ("We previously have stated, on numerous occasions, that a plaintiff alleging employment discrimination under Title VII may allege these claims quite generally.  A complaint need not allege all, or any, of the facts logically entailed by the claim, and it certainly need not include evidence.") (footnote, quotations, and citations omitted).  Ms. Ohaeme may rely on facts regarding comments and/or questions related to lions and tigers or poverty in Nigeria.

2.      *"Facts Regarding Instances Where [Ms.] Ohaeme Believes Comments Were Made Regarding Her Success as a Female"*

Ms. Ohaeme's EEOC Charge alleges that she was discriminated on the basis of her gender, notes that she was the only female sales associate, that she was very successful, that a balloon with a drawing of a penis on it was placed on her desk, that she was called "Black Bitch" and "cunt," that management gave her sales to male sales associates because "said [she] ha[d] enough sales," and that "management never gave [her] any sales." [Filing No. 64-6 at 1.]  It was therefore very clear that she believed she was treated differently based on her gender and her success as a woman. To be sure, Ms. Ohaeme's Complaint asserts these exact allegations.  [Filing No. 1.] And like the above, Andy Mohr's challenge is focused on facts, not the preservation of gender discrimination claims and is therefore unpersuasive for the same reasons.  Ms. Ohaeme may rely on facts regarding instances where she believes comments were made regarding her success as a female.

3.      *"Any Claim of Constructive Discharge"*

The Seventh Circuit recognizes two forms of constructive discharge: "when an employee resigns due to discriminatory harassment, and when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Beverly v. Abbott Lab'ys.*, 107 F.4th 737, 745 (7th Cir. 2024) (cleaned up, quotations and citation omitted); *see also Ziccarelli*, 35 F.4th at 1091.

Keeping in mind that the standard for exhaustion is liberal and that this inquiry is not whether a claim for constructive discharge will ultimately survive summary judgment, the Court finds that Ms. Ohaeme exhausted both forms of constructive discharge.  As to a claim for constructive discharge based on discriminatory harassment, both prongs of the exhaustion test are met.  Such a claim is both "like or reasonably related to the EEOC charge," and "can be reasonably expected to grow out of [the] EEOC investigation of the charges." *Cervantes*, 914 F.3d at 565.

24

Both the EEOC Charge and the Complaint contain the same allegations involving the same individuals and paint a picture of how Ms. Ohaeme interpreted several events as discriminatory and/or harassing and how she continually reported the events as a problem without management taking remedial action.  In other words, her EEOC Charges does not just describe one or two instances—it details several events and repeatedly alleges that nothing was done despite her reports, leaving Ms. Ohaeme to face the treatment without support from her employer.  Further, Ms. Ohaeme resigned days after filing her EEOC Charge.  [Filing No. 48-2 at 5; Filing No. 64-3 at 39; Filing No. 64-7 at 4.]  Therefore, even though the EEOC Charge does not include the fact of Ms. Ohaeme's resignation, both Andy Mohr and the EEOC knew of her resignation at the time of the EEOC's investigation.  [Filing No. 48-2 at 5; Filing No. 64-3 at 39; Filing No. 64-7 at 4.]  So, given the alignment of the allegations across the EEOC Charge and the Complaint, it is reasonable to expect that this claim would grow out of the EEOC's investigation of Ms. Ohaeme's EEOC Charge.  *Cervantes*, 914 F.3d at 565.

The analysis for the second form of a constructive discharge is similar to the first.  Both the EEOC Charge and the Complaint describe how Ms. Ohaeme was eventually assured that the troublesome treatment she was experiencing would end, and then during a follow-up meeting, was told by Mr. Hurst (the General Manager) that she would be terminated if her complaints about harassment continued.  In other words, the same allegations, the same conduct, and the same individuals are involved across the EEOC Charge and the Complaint, and a constructive discharge claim that Ms. Ohaeme felt compelled to resign because she was told that she would be terminated certainly grows out of her EEOC Charge.  And like the above, the fact that Ms. Ohaeme filed her EEOC Charge a few days before her resignation does not change the analysis because both Andy Mohr and the EEOC knew of Ms. Ohaeme's resignation at the time of the EEOC's investigation.

Stated differently, Andy Mohr's timing argument is unpersuasive because it focuses on whether claims are perfectly pled or perfectly amended in an EEOC Charge, which is not the proper test for exhaustion. *Cervantes*, 914 F.3d at 565; *Cheek*, 31 F.3d at 500 ("[A] Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint."); *see also Huri*, 804 F.3d at 831 (courts construe the scope of an EEOC charge liberally).

4.    *Retaliation*

Ms. Ohaeme has likewise exhausted a retaliation claim based on the theory that she was constructively discharged in anticipation of termination after Mr. Hurst's statement about terminating her if she complained about harassment again. This is the only retaliation claim that is fairly presented in Ms. Ohaeme's EEOC Charge. It is the only retaliation claim that is reasonably related to the allegations in her EEOC Charge, and it could have reasonably developed from the EEOC's investigation because the same parties are involved and the EEOC knew about the incident and about Ms. Ohaeme's resignation shortly thereafter. *Cervantes*, 914 F.3d at 565. As to the failure of Ms. Ohaeme to check the box for "retaliation" on the EEOC Charge, it is not fatal considering the specifics of her allegations. *See Bilal v. Rotec Indus., Inc.*, 326 F. App'x 949, 953 (7th Cir. 2009) (explaining that courts "look to the substance of the charges, not merely whether a particular box was checked on the EEOC form"); *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 169 (7th Cir. 1976) (holding that specifics in the EEOC charge form are sufficient to state a claim despite the lack of a check in the EEOC form box).

In sum, Andy Mohr's Motion for Summary Judgment as to whether Ms. Ohaeme properly exhausted her administrative remedies is **DENIED**. Ms. Ohaeme may rely on facts regarding lions, tigers, and poverty in Nigeria and facts regarding instances where she believes comments

were made regarding her success as a female.  Further, Ms. Ohaeme's claims of constructive discharge and retaliation based on constructive discharge in anticipation of termination after Mr. Hurst's statement about terminating her for future complaints survive Andy Mohr's exhaustion challenge.  The merits of such claims are considered separately below.

### B.    Title VII Discrimination Claims in the Form of Harassment

In support of its Motion, Andy Mohr argues that it is entitled to summary judgment on Ms. Ohaeme's claims of discrimination in the form of harassment/hostile work environment based on her sex and race because Ms. Ohaeme does not have evidence that the incidents that occurred "were because of her sex or race," which dooms her claims.  [Filing No. 51 at 17; Filing No. 51 at 23.]  It asserts that the incidents occurred because of her success as a sales associate and notes that many of the incidents were perpetrated by members of the same race as her, which it argues supports a finding that race was not a motivating factor.  [Filing No. 51 at 18; Filing No. 51 at 23.]  Andy Mohr contends that Ms. Ohaeme did not assert a claim of harassment based on her national origin and so cannot assert it now.  [Filing No. 51 at 18.]  It argues that none of the incidents were sufficiently severe or pervasive as required by Title VII and argues that even though a few of the incidents involved managers, none of them rise to the level of a hostile work environment.  [Filing No. 51 at 23-24.]  It also asserts that there is no basis for employer liability because it "took reasonable steps to discover and rectify the alleged harassing behavior" by her co-workers and none of the alleged supervisor harassment resulted in a tangible employment action, so it can avail itself of the *Faragher-Ellerth* affirmative defense, which it satisfies by having a robust anti-harassment policy with several reporting options and Ms. Ohaeme's failure to report any supervisor harassment.  [Filing No. 51 at 24-26.]

In response, Ms. Ohaeme argues that "[t]he racial and sexual epithets and derogatory

comments about [her] national origin" are sufficient evidence to conclude that the conduct was based on her race, sex, and national origin. [Filing No. 72 at 12.]  Regarding not asserting a harassment claim based on national origin, she contends that "[i]n the Title VII context, the terms [race and national origin] overlap as a legal matter." [Filing No. 72 at 14 (quoting *St. Francis Coll. V. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring)).] She argues that the conduct of her co-workers and managers was sufficiently severe and pervasive and notes that the Court must consider the totality of circumstances when analyzing whether conduct was severe and pervasive, and not look at each incident in a vacuum. [Filing No. 72 at 12-13.]  She asserts that there is employer liability because she was harassed by her managers, which results in strict liability,[9] and because Andy Mohr was negligent in failing to prevent the harassment by co-workers. [Filing No. 72 at 18-20.]

In reply, Andy Mohr reiterates that Ms. Ohaeme's claims of a hostile work environment based on race and sex fail because she has not met her burden of producing evidence that: (1) the harassment was based on her race and sex; (2) that it was sufficiently severe and pervasive; and (3) there is employer liability. [Filing No. 67 at 9-15.]  Relating to severity and pervasiveness, it argues that the incidents Ms. Ohaeme complains about occurred over a two-year period, which shows that they were isolated and sporadic events and are not enough to meet the requisite standard. [Filing no. 67 at 10-11.]  It reiterates its arguments relating to employer liability. [Filing No. 67 at 13-14.]  It also reiterates that Ms. Ohaeme's Complaint and Statement of Claims did not assert a harassment claim based on national origin and that she cannot assert it now. [Filing No. 67 at 9.]

---

[9] Ms. Ohaeme merely argues that an employer is strictly liable for a supervisor's harassment without explicitly acknowledging the law regarding the *Faragher-Ellerth* affirmative defense to supervisor harassment or Andy Mohr's arguments on the defense. [*See* Filing No. 72 at 18-19.]

### 1.    *National Origin Claim*

The Court turns first to the parties' arguments regarding Ms. Ohaeme's claim of harassment based on national origin. Despite being included in her EEOC Charge, this claim was neither pled in her Complaint nor included in the Statement of Claims. [Filing No. 1; Filing No. 39.] This failure prohibits her from asserting it here. *See Jackson v. Regions Bank,* 838 F. App'x 195, 198 (7th Cir. 2021) (finding "no abuse of discretion in the district court's enforcement of its requirement that [the plaintiff] specifically state [her] theories of relief" in the Statement of Claims). Accordingly, there is no claim for a harassment based on national origin in this case.

Ms. Ohaeme's argument that race and national origin "overlap as a legal matter" does not save her claim. [Filing No. 72 at 16.] But the law that Ms. Ohaeme cites in support of her argument is instructive as to her a claim of harassment based on race. In other words, although there is no claim based on national origin, any references to Ms. Ohaeme's national origin can be considered as relevant evidence under a claim of harassment based on race. *See Saint Francis Coll.*, 481 U.S. 604, 613 (1987) ("[A]t a minimum, [the prohibition against racial discrimination] reaches discrimination against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens.") (quotations, citation, and emphasis omitted).

The Court **GRANTS** Andy Mohr's Motion for Summary Judgment as to any claim for Title VII harassment claim based on national origin.

### 2.    *Gender Harassment Claim*

The Court turns to whether Ms. Ohaeme has presented sufficient evidence for a reasonable jury to conclude that Andy Mohr subjected her to actionable harassment based on her gender.

"Title VII does not impose a flat ban on all harassment." *Smith v. Rosebud Farm, Inc.*, 898

F.3d 747, 750 (7th Cir. 2018) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  "It prohibits harassment that discriminates against an individual 'because of such individual's [protected characteristics].'" *Smith*, 898 F.3d at 750 (quoting 42 U.S.C. § 2000e-2(a)(1)).  The protected characteristics include "race, color, religion, sex, [and] national origin." 42 U.S.C. § 2000e–2.  Either sexual harassment or "words or conduct demonstrating 'anti-female animus' can support a sexual harassment claim based on a hostile work environment." *Passananti v. Cook Cnty.*, 689 F.3d 655, 664 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007)).

To prevail on a harassment claim under Title VII, a plaintiff must show that: "(1) her environment was both objectively and subjectively offensive, (2) the harassment she complained of was based on [her protected characteristic], (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Anderson*, 104 F.4th at 652 (quotation and citation omitted).

a.    <u>Objectively and Subjectively Offensive</u>

There is no doubt nor dispute that Ms. Ohaeme found her work environment subjectively offensive.  [*See* Filing No. 51 at 15-26.]  Regarding objective offensiveness, this element is barely disputed by Andy Mohr.  [*See* <u>Filing No. 51 at 15-26</u>.]  It asserts in only one line without any citation to authority or fact that "none of the claimed instances would be objectively offensive to a reasonable person."  [<u>Filing No. 51 at 15</u>.]

Applying the appropriate standard in ruling on summary judgment, the Court concludes that a reasonable person could find the harassment that Ms. Ohaeme suffered while employed at Andy Mohr to be objectively offensive.  Most significantly, she was referred to as a "cunt" by a co-worker, was subjected to a repeated and hostile use of the epithet "Black bitch" by co-workers,

was told by a male colleague after a dispute that he knew where she lived, and was subjected to a constant barrage of misogynistic comments from both managers and co-workers. This is sufficient to show objective offensiveness. *See Passananti*, 689 F.3d at 666 ("[W]e do reject the idea that a female plaintiff who has been subjected to repeated and hostile use of the word 'bitch' must produce evidence beyond the word itself to allow a jury to infer that its use was derogatory towards women.")

                b.    <u>Based on Protected Characteristic</u>

As to the second element (harassment based on protected characteristic), "a connection between the harassment and the plaintiff's protected class need not be explicit, [but] there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (emphasis in original) (citing *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) (quotations omitted)). The use of the word "bitch" toward a female employee can be harassment based upon gender. *Passananti*, 689 F.3d at 665-66 ("The word is gender-specific, and it can reasonably be considered evidence of sexual harassment" depending on the context).

Here, the following is some admissible evidence from which a reasonable jury could infer that a large portion of the harassment that Ms. Ohaeme experienced was based on her sex:

- Mr. Hurst and Mr. Burd's comments during her interviews regarding not having hired a woman before and how selling cars is a man's job;

- Co-workers and managers telling Ms. Ohaeme on a monthly basis that selling cars is not a woman's work;

- Mr. Richardson taking a split deal away from her by calling the male sales associate to come into work to take the deal over and Mr. Burd reassigning two customers who came in to see her to male sales associates such that a split deal was forced upon her;

31

- Multiple co-workers calling her a "Black bitch" to her face and when she walked by (a total of five times);

- A balloon with a penis drawn on it placed on her desk for everyone at work to see; and

- A co-worker calling her a "cunt" on TikTok.[10]

It is easy to dismiss Andy Mohr's argument on this element because Andy Mohr does not confront any of this evidence or even mention it. [Filing No. 51 at 17-18.] Instead, Andy Mohr attempts to draw the Court's attention to other evidence in the case (unplugging of her computer, etc.) to show that the harassment was neutral in terms of protected characteristics. [Filing No. 51 at 17-18; Filing No. 67 at 9-10.] But a truthful consideration of the evidence reveals multiple instances from which a reasonable jury could conclude the harassment was connected to Ms. Ohaeme's gender.

## c.    Severe or Pervasive

Relating to the third element (whether conduct is severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment), the Court considers the totality of the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Scaife v. U.S. Dep't of Veteran Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022) (citing *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013)).

---

[10] Andy Mohr makes a big deal out of the fact that Mr. Derbyshire called Ms. Ohaeme a cunt in a comment where he was defending her from a racist comment someone else had posted. The Court fails to see how this fact makes the term any less derogatory or demeaning. [Filing No. 51 at 12; Filing No. 51 at 22.]

"[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) (citation omitted).    Additionally, "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable." *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463 (7th Cir. 2002) (quotation and citation omitted).  However, "[t]here is no 'magic number' of instances or type of slur that indicates a hostile work environment." *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)); *see also Boumehdi*, 489 F.3d at 789.  "Because harassment need not be both severe *and* pervasive to establish a hostile work environment, a severe episode that occurs as rarely as once or a relentless pattern of lesser harassment can be sufficient to meet the standard." *E.E.O.C. v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 402 (7th Cir. 2024) (quotations and citations omitted, emphasis in original).  When analyzing this element, "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (quoting *Hall v. City of Chi.*, 713 F.3d 325, 331 (7th Cir. 2013)).

Here, Ms. Ohaeme was subject to no less than six gender-based slurs ("Black bitch" and "cunt"), was laughed at by her supervisor after at least one instance of reporting the slur "Black bitch," was repeatedly subject to anti-female remarks that selling cars is not a woman's job by both managers and co-workers, had customers (and thereby commissions) taken away from her by a male manager and given to male sales associates in contravention of standard policy, and had a balloon with a drawing of a penis on it placed openly on her desk for everyone to see.  These events were (1) objectively offensive, (2) pervasive as they permeated every aspect of her employment

environment—her relationship with her managers, her relationship with her co-workers, her ability to interact with her customers, and her ability to earn money—and (3) directed at Ms. Ohaeme.[11]

Accordingly, a reasonable jury could conclude that the conduct was severe and pervasive enough to alter the conditions of Ms. Ohaeme's employment and create a hostile work environment. *Passananti*, 689 F.3d at 668-69 ("There is no question that gender-based comments and epithets, when used pervasively in the workplace, can meet the standard for severe or pervasive harassment."); *Boumehdi*, 489 F.3d at 788-89 (reversing summary judgment for employer because a slew of anti-female remarks and sexual references was sufficient evidence from which a reasonable jury could conclude that the comments were both severe and pervasive to support a gender-based hostile work environment claim); *cf. Jones v. City of Chi.*, 673 F. Supp. 3d 926, 941 (N.D. Ill. 2023) (granting summary judgment to employer, finding that two sexist comments about women being police officers did not amount to severe or pervasive); *Anderson*, 104 F.4th at 652 (affirming summary judgment for employer on hostile work environment claim based on sex where employee was touched inappropriately three or four times, called a "bitch" once, and instructed to wear tight, form-fitting clothing because they were isolated incidents and not severe or pervasive).

Andy Mohr's argument that the harassment consisted only of "isolated instances" occurring "over a *two* year period," [Filing No. 51 at 18; Filing No. 67 at 10-11 (emphasis in original)], is unpersuasive. This argument fails to consider all of the evidence and looks at each incident in a vacuum, without considering the context and the totality of circumstances. Further, the frequency

---

[11] Andy Mohr minimizes the instances of Ms. Ohaeme being called a "Black bitch" by arguing that it was only directed at her once and that the other instances were not directed at her. [Filing No. 51 at 20.] However, the evidence shows that the group of sales associates that used the slur as she walked by said it loudly enough for her—the only female sales associate—to hear, making it indeed directed at her. [Filing No. 64-3 at 64-65; Filing No. 64-3 at 184-85.]

and severity of harassment at issue here cannot be deemed "off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace," *Swyear*, 911 F.3d at 881 (citation omitted), or the "occasional vulgar banter . . . of coarse or boorish workers," *Hilt-Dyson*, 282 F.3d at 463.  When considering the context, the fact that the incidents took place over a two-year period adds fuel to the fire, rather than douses it.  The very fact that the anti-female comments, derogatory name calling, and sexist treatment persisted for two years despite Ms. Ohaeme's consistent and repeated reports to management is evidence from which a jury could conclude that the environment was severe and/or pervasive.  *See Passananti*, 689 F.3d at 667-69; *Boumehdi*, 489 F.3d at 788-89.

### d.    Employer Liability

There are two standards for employer liability based on whether the alleged harassment occurred at the hands of a co-worker or supervisor.  *Vance v. Ball State Univ.*, 570 U.S. 421, 424, (2013).  The Court analyzes each separately.

### i.    Harassment by Co-workers

"If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vill. at Hamilton Pointe LLC*, 102 F.4th at 403 (quoting *Vance*, 570 U.S. at 424).  "This negligence may occur either in failing to discover or in failing to remedy the harassment." *Vill. at Hamilton Pointe LLC*, 102 F.4th at 403 (citations omitted).  In other words, "[t]o avoid liability, the employer must respond in a manner reasonably likely to end the harassment." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022) (quoting *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011)); *see also Trahanas v. Northwestern Univ.*, 64 F.4th 842, 855 (7th Cir. 2023).  The law does not "expect employers to be aware of every impropriety committed by every low-level employee, [so] 'notice

or knowledge of the harassment is a prerequisite for liability.'" *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 958 (7th Cir. 2024) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998)).

Andy Mohr argues that it was neither negligent in discovering nor remedying the harassment because after each report by Ms. Ohaeme, it "took prompt and reasonable steps to ensure it did not occur again." [Filing No. 51 at 24.] Specifically, Andy Mohr focuses its argument only on the instances of her computer being unplugged in its opening brief, and only in its reply acknowledges the other incidents of harassment. [Filing No. 51 at 24-25; Filing No. 67 at 13-14.]

Andy Mohr's arguments are unpersuasive. Andy Mohr was on notice of each incident of co-worker harassment as Ms. Ohaeme consistently reported the incidents as directed per Andy Mohr's Policy, and there is evidence that both Mr. Hurst and Mr. Burd believed that the use of the epithets were harassing—that is, they did not think the slurs used by Ms. Ohaeme's co-workers were appropriate. Despite recognizing that the slurs were not appropriate, there is no evidence that Andy Mohr took action between the second and fourth reports.

The law is clear that, "[t]o avoid liability, the employer must respond in a manner reasonably likely to end the harassment." *Paschall*, 28 F.4th at 815. Inaction is not reasonably likely to end harassment. And despite withholding one week's SPIFF incentive and making some employees apologize to Ms. Ohaeme, a reasonable jury could conclude that these responses were not only ineffective but unreasonable as the responses did not deter the harassment. This is evidence from which a reasonable jury could conclude that Andy Mohr was negligent in remedying sex-based harassment of Ms. Ohaeme by her co-workers and therefore liable.

### ii.    Harassment by Supervisors

When the harasser is a supervisor, "the employer is strictly liable and can only escape that

liability if no tangible employment action had been taken, and the employer establishes, 'as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) . . . the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.'" *Vill. at Hamilton Pointe LLC*, 102 F.4th at 405 (quoting *Vance*, 570 U.S. at 424); *see also Trahanas*, 64 F.4th at 854 (referring to this affirmative defense as the *Faragher-Ellerth* defense). A tangible employment action "requires an official act of the enterprise," such as "a significant change in employment status, [like] hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998). "A tangible employment action in most cases inflicts direct economic harm." *Id.* at 762.

Andy Mohr asserts that it establishes the *Faragher-Ellerth* defense to liability for supervisor harassment because Ms. Ohaeme "presents no evidence (and there is none) of any tangible employment action" by the supervisors. [Filing No. 51 at 25.] However, this argument selectively ignores a portion of Ms. Ohaeme's evidence.

Ms. Ohaeme has presented evidence that the following gender-related actions were taken by her supervisors: (1) Mr. Richardson taking a split deal away from her by calling the male sales associate to come into work; (2) Mr. Burd reassigning two customers who came in to see her to male sales associates such that a split deal (instead of full commission) was forced upon her; and (3) management giving Mr. Mitchell full commission after he helped Ms. Ohaeme's customer despite Ms. Ohaeme's presence and availability to do the same, instead of splitting the commission with Ms. Ohaeme per usual policy. A jury could find that Andy Mohr management's actions of taking away split deals, reassigning customers to male sales associates, and not giving Ms. Ohaeme credit for split deals to which she was entitled was a form of sex-based harassment and that it

inflicted direct economic harm, thereby constituting a tangible employment action by her supervisors for which Andy Mohr is strictly liable.[12]    Accordingly, Andy Mohr is not entitled to judgment as a matter of law regarding the *Faragher-Ellerth* affirmative defense to Ms. Ohaeme's claim of sex-based harassment based on her supervisors' actions of reassigning customers and split deals.  In other words, there is a question of fact regarding the viability of the *Faragher-Ellerth* affirmative defense.

In sum, Ms. Ohaeme has produced evidence from which a reasonable jury could conclude that she suffered actionable sex-based harassment for which Andy Mohr is liable due to negligently controlling co-worker harassment.  And Ms. Ohaeme has also produced evidence from which a reasonable jury could conclude that she suffered actionable sex-based harassment at the hands of her supervisors for which Andy Mohr is liable.

The Court **DENIES** Andy Mohr's Motion for Summary Judgment as to Ms. Ohaeme's claims of sex-based co-worker harassment and sex-based supervisor harassment based on the actions of reassigning customers and split deals.

### 3. Race Harassment Claim

The Court follows the same law as set forth above in analyzing whether Ms. Ohaeme has presented sufficient evidence of a race-based harassment.  *Paschall*, 28 F.4th at 813 ("Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment.") (citation omitted).

---

[12] Despite Ms. Ohaeme's failure to explicitly address Andy Mohr's *Faragher-Ellerth* affirmative defense argument in the section of her response addressing employer liability for supervisor harassment, Ms. Ohaeme elsewhere clearly argues that her supervisors' actions of reassigning customers and split deals amounts to a tangible adverse employment action for which Andy Mohr is strictly liable.  [Filing No. 72 at 24-25.]  Because several arguments and elements overlap in this case, the Court construes that argument to apply here.

a.    Objectively and Subjectively Offensive

As with Ms. Ohaeme's gender harassment claim, there is no doubt or dispute regarding subjective offensiveness.  [*See* Filing No. 51 at 15-26.]  And like above, Andy Mohr barely disputes the element of objective offensiveness, only asserting in one line without any citation that "none of the claimed instances would be objectively offensive to a reasonable person."  [Filing No. 51 at 15.]

A reasonable person, however, could find the racially charged harassment, including the repeated use of the epithets "Black bitch" and Nigerian Nightmare, to be objectively offensive. *See Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010) (denying employer's summary judgment motion as to plaintiff's race-based harassment claim where plaintiff was called "Black bitch" among other racial epithets by co-workers over a three-month period).

b.    Based on Protected Characteristic

A reasonable jury could conclude that some of the harassment that Ms. Ohaeme suffered was due to her race.  The evidence shows that her co-workers repeatedly called her a "Black bitch" and both co-workers and Mr. Richardson referred to her as the Nigerian Nightmare.  While the nickname Nigerian Nightmare certainly speaks to Ms. Ohaeme's national origin, a jury could also consider it as connected to her race.  *See Saint Francis Coll.*, 481 U.S. at 613 ("[A]t a minimum, [the prohibition against racial discrimination] reaches discrimination against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens.") (quotations, citation, and emphasis omitted).  And while the male sales associates who called her a "Black bitch" were also Black or multi-racial, this evidence does not mean that as a matter of law that their actions could not be based on her race.  "There can, it is true, be 'racial' discrimination within the same race, broadly defined, because 'race' is a fuzzy term."  *Williams v.*

*Wendler*, 530 F.3d 584, 587 (7th Cir. 2008).  Ms. Ohaeme has presented evidence from which a reasonable jury could find that she suffered harassment due to her race.

c.    <u>Severe or Pervasive</u>

In considering the totality of circumstances and the factors used to determine whether this element is met, the Court highlights that Ms. Ohaeme was called a "Black bitch" five times by co-workers (once to her face, and four times loudly enough for her to hear when she walked by) and referred to as Nigerian Nightmare by Mr. Richardson (a supervisor) and her co-workers.  While the frequency of race-based harassment is not as intense as the alleged sex-based harassment highlighted above, the Court reiterates that there is no "magic number" of instances or slurs required and that context and the totality of circumstances matters.  *Boumehdi*, 489 F.3d at 789; *Alamo*, 864 F.3d at 550; *Scaife*, 49 F.4th at 1116; *Passananti*, 689 F.3d at 668 (stating that "racially-charged words can certainly suffice" as evidence of severe or pervasive harassment).  Particularly significant here in terms of context is that the slurs were used openly in the workplace while she walked by, came from both fronts—co-workers and managers—and, when it came to being called a "Black bitch," her supervisors only intervened on two of the five instances.  This is evidence from which a reasonable jury could conclude that the alleged race-based harassment was severe and/or pervasive.

d.    <u>Employer Liability</u>

**i.    Harassment by Co-workers**

The analysis above regarding Ms. Ohaeme's sex-based co-worker harassment claim also applies here.  There is no evidence that Andy Mohr took any action between the second and fourth instances of Ms. Ohaeme's reports of being called a "Black bitch" and despite stating that a camera would be installed, it appears that no action was taken on fulfilling that statement.  Like above,

40

this inaction is evidence from which a reasonable jury could conclude that Andy Mohr did not act reasonably in remedying the alleged race-based harassment by Ms. Ohaeme's co-workers and is therefore liable. *Paschall*, 28 F.4th at 815 ("To avoid liability, the employer must respond in a manner reasonably likely to end the harassment."); *see also Sutherland*, 632 F.3d at 995.

### ii.     Harassment by Supervisors

Andy Mohr asserts the same argument from Ms. Ohaeme's sex-based supervisor harassment claim—that it establishes the *Faragher-Ellerth* defense to supervisor race-based harassment because Ms. Ohaeme "presents no evidence (and there is none) of any tangible employment action" by the supervisors. [Filing No. 51 at 25.] But again, this argument selectively ignores the evidence that Mr. Richardson took away a split deal from Ms. Ohaeme by calling Mr. Starrett (White, non-Nigerian) to come into work to help his previous customer and that Mr. Burd reassigned two customers who came in to see her to White, non-Nigerian male sales associates. Both Mr. Richardson and Mr. Burd are White males, and Mr. Richardson was responsible for coining the epithet Nigerian Nightmare. Accordingly, a reasonable jury could find that Mr. Richardson's and Mr. Burd's actions of reassigning customers to White and non-Nigerian sales associates was a form of race-based harassment toward Ms. Ohaeme and that it inflicted direct economic harm, thereby constituting a tangible employment action by her supervisors for which Andy Mohr is strictly liable. Andy Mohr is therefore not entitled to judgment as a matter of law regarding the *Faragher-Ellerth* affirmative defense to Ms. Ohaeme's claim of race-based harassment based on her supervisors' actions of reassigning customers and split deals. As with her sex-based supervisor harassment claim, there is a question of fact regarding the viability of the *Faragher-Ellerth* affirmative defense here.

In sum, Ms. Ohaeme has produced evidence from which a reasonable jury could conclude

that she suffered actionable harassment based on her race at the hands of both her co-workers and supervisors for which Andy Mohr is liable. The Court **DENIES** Andy Mohr's Motion for Summary Judgment as to Ms. Ohaeme's claims of race-based co-worker harassment and race-based supervisor harassment.

### C.    Title VII Discrimination Claims in the Form of Disparate Treatment

In support of its Motion, Andy Mohr argues that it is entitled to summary judgment on Ms. Ohaeme's Title VII claims of sex, race, and national origin discrimination because she does not have evidence of a prima facie case of disparate treatment as to any protected characteristic. [Filing No. 51 at 29.] It asserts that "she was not subjected to any adverse employment action, let alone an adverse employment action because of her race, sex, or national origin" because she was "not disciplined, written up, counselled, demoted, transferred, or terminated at any point during her employment [and her] compensation, and/or benefits were never adversely changed during her employment." [Filing No. 51 at 26-28.] Andy Mohr asserts that Ms. Ohaeme "has [also] not identified a single similarity-situated employee outside of her protected class who was treated more favorably," and that even if Ms. Ohaeme can state a prima facie case of sex, race, or national origin discrimination, it can show a legitimate non-discriminatory reason for "the actions it took in response to [Ms.] Ohaeme's complaints." [Filing No. 51 at 31.]

Ms. Ohaeme argues in her response that the adverse action supporting her claim for discrimination based on disparate treatment is having sales and split deals taken away from her

and given to male sales associates.[13]  [Filing No. 72 at 24] ("[T]here is no doubt that Defendant subjected [Ms.] Ohaeme to different terms and conditions due to her sex" based on this action).] She asserts that the practice of reassigning customers to male sales associates "resulted in a discriminatory practice that impacted [her] economically," that she was never given any of the male sales associates' sales, and that she was treated less favorably than her co-workers.  [Filing No. 72 at 24-25.]

In its reply, Andy Mohr reiterates its argument that Ms. Ohaeme does not have evidence that she was subjected to different terms and conditions of employment based on her race, gender, or national origin.  [Filing No. 67 at 17.]  It argues that Ms. Ohaeme "testified that she was given split deals for other sales associate[s'] customers," and therefore "has not provided evidence of any disparate treatment with how Andy Mohr handled sales."  [Filing No. 67 at 17.]  It reiterates its argument regarding similarly situated employees.  [Filing No. 67 at 17-18.]

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1); *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024).  Simply put, "the statute targets practices that 'treat[ ]

---

[13] Ms. Ohaeme also argues that she was subjected to a harassing workplace environment at the hands of both co-workers and managers, which is an adverse action that supports a discrimination claim.  [Filing No. 72 at 21-25.]  This claim, however, is the same as her Title VII harassment claims, just worded differently.  *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) ("To state a claim for discrimination based on a hostile work environment, the plaintiffs must show that (1) they were subject to unwelcome harassment; (2) the harassment was based on their race; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability.");  *Alamo*, 864 F.3d at 549-50 (explaining that one way to prove Title VII discrimination is by harassment/a hostile work environment).  Because the Court already analyzed Ms. Ohaeme's claims of discrimination based on harassment, the Court will not revisit the claims here.

a person worse' because of sex or other protected trait." *Id.* (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 658 (2020)). The treatment must be worse, but it need not be "significant . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow*, 601 U.S. 355.

To succeed on a discrimination claim based on disparate treatment under Title VII, Ms. Ohaeme must demonstrate: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) causation, *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022), which requires showing that membership in a protected class was "a motivating factor in the defendant's challenged [employment] decision," *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020) (quotation omitted).

"[T]he singular question that matters in a discrimination case [is]: '[W]hether the evidence would permit a reasonable factfinder to conclude that plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson*, 892 F.3d at 894 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); *see also Igasaki v. Ill. Dep't of Fin. & Prof. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) ("Under *Ortiz*, we therefore ask whether the totality of the evidence shows discrimination, eschewing any framework or formula."). Nevertheless, the *McDonnell Douglas* burden-shifting framework "remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson*, 892 F.3d at 894 (citation omitted).

The *McDonnell Douglas* burden-shifting framework requires an evaluation of whether the plaintiff has evidence that "[s]he is a member of a protected class, who was meeting the defendant's legitimate expectations, that [s]he suffered an adverse employment action, and that similarly situated employees who were not members of [her] protected class were treated more favorably."

44

*Singmuongthong v. Bowen*, 77 F.4th 503, 507 (7th Cir. 2023) (citation omitted); *Johnson*, 892 F.3d at 895 (citation omitted). "Once those elements are met, the burden shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant does so, then the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Singmuongthong*, 77 F.4th at 507-08 (citation omitted). The parties do not dispute that Ms. Ohaeme is a member of a protected class and was meeting Andy Mohr's legitimate expectations. Therefore, the Court focuses only on the remaining elements of the framework.

Here, Ms. Ohaeme has presented sufficient evidence to state a prima facie case under the *McDonnell Douglas* framework and under *Ortiz*. The Court focuses only on Ms. Ohaeme's gender discrimination claim because Ms. Ohaeme framed her argument and evidence of discriminatory treatment based on assignment of customers and split deals as based only on her gender. [Filing No. 72 at 24.][14]

### 1.    *Adverse Employment Action*

"[T]ermination or reduction in compensation, fringe benefits, or other financial terms of employment," meet the threshold for an adverse employment action under Title VII. *West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2002) (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453-54 (7th Cir. 2011)). Here, Ms. Ohaeme's evidence regarding how split deals were taken away from her, how customers were reassigned to male sales associates, and how she was not given credit for

---

[14] The Court notes that Ms. Ohaeme did not present any argument that the assignment of sales and split deals constituted disparate treatment on the basis of her race or national origin, despite Andy Mohr's argument on the same. Undeveloped arguments are waived. *Anderson*, 104 F.4th at 654 n.3 (citing *Greenbank*, 47 F.4th at 629 (noting that courts "are not responsible for constructing the parties' arguments")). The Court **GRANTS** Andy Mohr's Motion for Summary Judgment as to Title VII claims for race-based and national origin-based disparate treatment based on discriminatory assignment of customers and split deals.

a split deal to which she was entitled is sufficient to meet the threshold of an adverse employment action because her compensation, which was only commission-based, was reduced by this practice. *West*, 48 F.4th at 849 (reduction in compensation is an adverse employment action).

### 2. Similarly Situated Employees Treated More Favorably

"[T]his inquiry is flexible, common-sense, and factual.  It asks 'essentially are there enough common features between the individuals to allow a meaningful comparison?' . . . In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)).

Here, Ms. Ohaeme has presented evidence regarding Andy Mohr's customer assignment policies and that on more than one occasion, the policies were not followed to her detriment.  *See* discussion *supra* Section III.C.2 (Statement of Facts on Customer Sales and Assignments).  She identified that Mr. Starrett, a sales associate just like Ms. Ohaeme, was called into work while he was at home to assist a customer despite the policy where a return customer is reassigned to a new sales associate if the original sales associate is not at work that day.  Notably, Ms. Ohaeme did not receive any commission for that instance, and she presented evidence that she was never called into work while at home to assist her customers.   Moreover, she presented evidenced that on two occasions, she was working and available when one of her customers returned, yet the customer was reassigned to a male sales associate instead of continuing to be assigned to her pursuant to policy, and she was then forced to take split deals instead of full commission.  She also presented evidence that she was entitled to a split deal under policy after Mr. Mitchell took her customer despite her availability to assist the customer, but management gave full commission to Mr.

Mitchell. This is evidence that Ms. Ohaeme's similarly situated male sales associates were treated more favorably than her and from which a reasonable juror could infer that the treatment was motivated by an impermissible animus due to her gender.

Andy Mohr's argument that Ms. Ohaeme was not treated differently because she also received split deals and was reassigned customers from male sales associates is unpersuasive. Ms. Ohaeme indeed testified that she was reassigned customers and benefitted from split deals, but only when the original sales associate was not present. [Filing No. 48-1 at 79-83 ("For the two years I was there, maybe three, four times that I was assigned a customer, they said, [Ms. Ohaeme], can you take care of this person because it's James' old sold, but James is on vacation. Can you take care of them?").] The fact that Ms. Ohaeme was assigned customers in accordance with policy does not negate the evidence that her customers were reassigned to another sales associate in contravention of policy.

### 3. Legitimate, Nondiscriminatory Reason for Adverse Employment Action

Andy Mohr only asserts that it has a legitimate, nondiscriminatory reason "for the actions it took in response to [Ms.] Ohaeme's complaints" of harassment. [Filing No. 51 at 31-32.] It does not assert an argument regarding a legitimate, nondiscriminatory reason for reassigning customers in contravention of policy, and therefore has not met its burden on this element.[15] *Singmuongthong*, 77 F.4th at 507-08.

In conclusion, Ms. Ohaeme has provided sufficient evidence under *McDonnell Douglas* of disparate treatment based on a discriminatory application of policy regarding customer and sales assignments. Moreover, when analyzing the evidence in "a single pile" and evaluating it "as a

---

[15] Since Andy Mohr has not met its burden on this element, the Court need not consider whether Ms. Ohaeme met her burden of showing that the explanation is pretextual. *See Singmuongthong*, 77 F.4th at 507-08.

whole" under *Ortiz*, the evidence would permit a reasonable factfinder to infer that Ms. Ohaeme's gender caused the discriminatory application of policy. *Ortiz*, 834 F.3d at 766. Andy Mohr's Motion for Summary Judgment is **DENIED** as to Ms. Ohaeme's claim of gender-based disparate treatment based on a discriminatory application of policy regarding customer and sales assignments.

### D.    Title VII Discrimination Claims Based on Constructive Discharge

Andy Mohr asserts that the evidence does not support Ms. Ohaeme's claim of constructive discharge and that her "attempt to manifest an adverse employment action by alleging she was constructively discharged" fails. [Filing No. 51 at 26-30; Filing No. 51 at 34-35.] It argues that she must prove "working conditions even more egregious than that required for a hostile work environment [or harassment] claim," and that she does not meet this heightened standard because the Andy Mohr "promptly addressed her complaints and took action to prevent any future complaints," and "even offered to transfer [Ms.] Ohaeme to another location." [Filing No. 51 at 29-30 (quoting *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022)).]

In response, Ms. Ohaeme argues that the Seventh Circuit recognizes two forms of constructive discharge—resignation due to severe discriminatory harassment and resignation in anticipation of termination—and that she has evidence to prove both theories. [Filing No. 72 at 21-24.] She summarizes the treatment she experienced, including the harassment and the conversation with Mr. Hurst where he told her that he would have to terminate her if her complaints continued, and asserts that this evidence meets the standard for both forms of constructive discharge. [Filing No. 72 at 21-24.]

Andy Mohr reiterates its argument that Ms. Ohaeme's resignation does not constitute an adverse action in the form of constructive discharge. [Filing No. 67 at 15-17.] It asserts that her

working conditions were not so "unbearable," and that she does not have sufficient evidence to prove that "the handwriting was on the wall" regarding anticipation of termination because "[s]he falsely claims [that Mr.] Hurst threatened to terminate her employment."[16] [Filing No. 67 at 16.] It notes that even after the conversation, Ms. Ohaeme continued to work at Andy Mohr for another month until she resigned, which it argues is "hardly writing on the wall." [Filing No. 67 at 16-17 (quotations and citation omitted).]

Ms. Ohaeme's claim of discrimination based on constructive discharge in violation of Title VII requires the same elements of proof as her Title VII disparate treatment claim analyzed directly above. The only element at issue in this claim, however, is whether Ms. Ohaeme's resignation qualifies as an adverse action in the form of constructive discharge. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) ("A constructive discharge constitutes an adverse employment action.") (citation omitted).

"To prevail on a claim of constructive discharge, [Ms. Ohaeme] must show 'that [s]he was forced to resign because h[er] working conditions, from the standpoint of the reasonable employee, had become unbearable.'" *Beverly*, 107 F.4th at 745. The Seventh Circuit recognizes two forms of constructive discharge: "when an employee resigns due to discriminatory harassment, and when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id.* (cleaned up, quotations and citation omitted); *see also Ziccarelli*, 35 F.4th at 1091. The Court analyzes each theory.

---

[16] The Court does not consider this argument in the analysis below because Ms. Ohaeme has presented admissible evidence regarding her version of the conversation, and the Court must accept her version as true for the purposes of summary judgment. *See supra* discussion Part III (explaining and citing numerous cases regarding the Court's assigned task of taking the facts in the light most favorable to the non-moving party).

### 1.    *Resignation Due to Discriminatory Harassment*

This form of constructive discharge "requires 'a discriminatory work environment even more egregious than the high standard for hostile work environment.'" *Beverly*, 107 F.4th at 745 (quoting *Scaife*, 49 F.4th at 1119). Courts find this form of constructive discharge where a plaintiff is subjected to a serious threat of violence or to bodily integrity. *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (constructive discharge standard met where harassment included repeated use of a noose and implied threats of physical violence); *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006) (constructive discharge standard met where plaintiff employee's supervisor "was an obsessed man who—based on previous acts showing no regard for [plaintiff's] right to control who could touch intimate areas of her body—was capable of, and desirous of, physically assaulting her in a serious way"); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (constructive discharge standard met where the plaintiff employee's supervisor repeatedly used racist comments toward the plaintiff, brandished a firearm, and held it to the employee's head). However, cases without threats of violence can also meet this form of constructive discharge when the harassment is highly egregious. *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225-26 (7th Cir. 2022) (standard for constructive discharge met where plaintiff employee was subjected to unrelenting verbal harassment with "over 1,000 insults that, coupled with co-workers interfering with his workspace and writing vulgar graffiti around the plant, eventually had physical effects on [plaintiff]," including nerve pain, inability to sleep, shaky hands, upset stomach, inability to eat, depression, and humiliation); *Boumehdi*, 489 F.3d at 790 (standard for constructive discharge met where plaintiff employee consistently reported her supervisor for harassing and discriminating conduct toward her, including at least eighteen sex-based and anti-female comments, comments about whether she had gotten a breast enlargement, retaliatory

comments about her reports to human resources, and where she experienced poor performance reviews by the supervisor after her complaints, yet management failed to take any remedial action on her complaints and plaintiff resigned).

Although Ms. Ohaeme meets the standard for hostile work environment claims, *see supra* discussion Section IV.B., the Court finds that she has not presented sufficient evidence to meet the higher standard required for this form of constructive discharge. Unlike the cases noted above, there were no serious physical threats to Ms. Ohaeme's safety, and although Ms. Ohaeme has certainly presented evidence of a hostile work environment, that evidence does not meet the egregiousness of instances found in *Stamey*, 37 F.4th at 1225-26 (over 1,000 insults), or the complete lack of remedial actions by the employer in *Boumehdi*, 489 F.3d at 790. Although Andy Mohr did not take action on every report of harassment, there is undisputed evidence that it at least investigated and took action on some complaints, including holding meetings with the entire sales team regarding the computer incidents and the balloon incident; independently interviewing several male sales associates regarding the balloon incident; taking away a weekly SPIFF incentive due to the balloon incident; making Mr. Jackson apologize after he called Ms. Ohaeme a "Black bitch" at work; giving verbal warnings regarding derogatory name calling; making Mr. Derbyshire delete the TikToks of Ms. Ohaeme and apologize to her; and writing Mr. Derbyshire up for his conduct related to the videos. These responses may very well result in a reasonable jury concluding that Ms. Ohaeme suffered harassment, but these responses, even if found to be meager, doom her claim for constructive discharge based on a discriminatory harassment. Andy Mohr's Motion for Summary Judgment is **GRANTED** to the extent that the Court finds that it is entitled to judgment as a matter of law on Ms. Ohaeme's Title VII claims of constructive discharge in the form of discriminatory harassment.

2.     *Resignation in Anticipation of Termination*

This form of constructive discharge "requires the plaintiff to show that 'she was forced to resign because her working conditions became so intolerable that a reasonable person would have felt compelled to resign.'" *Beverly*, 107 F.4th at 745 (quoting *Scaife*, 49 F.4th at 1119). "Working conditions become intolerable when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the [ ] employee resigns.  In other words, constructive discharge [ ] occurs where, based on an employer's actions, the handwriting [was] on the wall and the axe was about to fall." *Scaife*, 49 F.4th at 1119 (quotations and citations omitted); *see also Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired.")

Drawing every inference in Ms. Ohaeme's favor as the Court must on summary judgment, a reasonable jury could conclude that a reasonable employee in Ms. Ohaeme's position would have believed that "the handwriting [was] on the wall and the axe was above to fall" after Mr. Hurst's clear statement that he was tired of her complaints about harassment and intended to terminate her if she continued to complain.  *Scaife*, 49 F.4th at 1119 (quotations and citations omitted).  Despite the fact that Ms. Ohaeme remained employed after the conversation, the evidence shows that Andy Mohr suggested that she take leave to think after the conversation, and significantly, she did not return to work after her leave.  From this evidence, along with the totality of circumstances surrounding the continued harassment despite some remedial action, a reasonable jury could conclude that seeking redress would be futile, making her working conditions so unbearable that she was forced to resign in lieu of inevitable termination.  *See E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332-32 (7th Cir. 2002) (constructive discharge standard met where plaintiff

employee resigned after arriving at work to find her belongings packed and her office being used as storage); *cf. Beverly*, 107 F.4th at 746 (no constructive discharge claim where plaintiff employee continued to work for two years, asked for personal leave and extensions of leave, and there was no indication that the company intended to fire plaintiff); *Scaife*, 49 F.4th at 1119 (no constructive discharge claim where plaintiff employee did not receive communication that indicated "that her time at the [company] was coming to an end" or that her "job security was [ ] in peril").  The Court **DENIES** Andy Mohr's Motion for Summary Judgment to the extent that it finds that a genuine issue of material fact exists regarding Ms. Ohaeme's Title VII discrimination claim based on this form of constructive discharge.

### E.    Section 1981 Discrimination Claims in the Form of Harassment

#### 1.    Gender Harassment

Andy Mohr argues that Ms. Ohaeme cannot assert a claim under § 1981 for gender-based harassment because § 1981 only applies to race-based treatment.  [Filing No. 51 at 32-33.]  Ms. Ohaeme does not respond to this argument, [*see* Filing No. 72], which Andy Mohr highlights in its reply and asserts that summary judgment is therefore appropriate, [Filing No. 67 at 20].

Indeed, Ms. Ohaeme did not respond to Andy Mohr's argument.  This basis alone is sufficient to find that Andy Mohr is entitled to judgment on this claim.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver."); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) (recognizing that plaintiff was deemed to have abandoned an employment claim at the summary judgment stage when plaintiff failed to respond to defendant's summary judgment argument on the claim); *Hayes v. Exec. Mgmt. Servs., Inc.*, 2006 WL 1897959, at *7 (S.D. Ind. July 11, 2006) (finding summary

judgment appropriate where the plaintiff abandoned claims when it failed to respond to defendant's summary judgment arguments on the claims).

In any event, Andy Mohr is correct. Section 1981 prohibits racial discrimination in the making and enforcing of contracts, including employment contracts. 42 U.S.C. § 1981. It does not prohibit discrimination on the basis of other protected characteristics like Title VII does. *Id.*; 42 U.S.C. § 2000e-2(a) (prohibiting discrimination on the basis of race, color, religion, sex, and national origin); *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) ("Title VII, of course, prohibits both race and sex discrimination (among other forms) in the employment context, whereas section 1981 prohibits race discrimination in the making and enforcing of contracts.") (citing *Kyles v. J.K. Guardian Security Servs.*, 222 F.3d 289, 302-03 (7th Cir. 2000)); *see also Lewis*, 36 F.4th at 759. The Court **GRANTS** Andy Mohr's Motion for Summary Judgment to the extent that it finds that any claim for sex-based harassment in violation of § 1981 fails as a matter of law.

### 2.  *Race Harassment*

Andy Mohr argues that it is entitled to summary judgment on Ms. Ohaeme's race-based harassment claim under § 1981 because, although the legal analysis for racial harassment under § 1981 is largely identical to the analysis of the same claim under Title VII, § 1981 requires more stringent causation than Title VII. [Filing No. 51 at 32-33.] It argues that Ms. Ohaeme cannot meet the higher burden under § 1981 of showing that her race was a "but-for cause" of her injuries rather than a motivating factor. [Filing No. 51 at 32-33.]

Similar to the above claim, Ms. Ohaeme does not respond to this argument or assert any argument regarding a race-based harassment claim under § 1981 or even mention such a claim. [*See* Filing No. 72.] Instead, Ms. Ohaeme focuses only on responding to Andy Mohr's Title VII

arguments. [*See* Filing No. 72.] Andy Mohr likewise highlights Ms. Ohaeme's failure to address its § 1981 racial harassment argument and argues that she therefore has abandoned or waived such a claim. [Filing No. 51 at 32-33.]

Andy Mohr is correct. Although the law largely overlaps between Title VII and § 1981, the law is clear that a plaintiff pursuing a § 1981 racial harassment claim "bears the burden of showing that race was a but-for cause of [her] injury," instead of a "motivating factor." *Lewis*, 36 F.4th at 759 ("The legal analysis for discrimination claims under Title VII and § 1981 is largely identical. Race discrimination claims under Title VII simply require that race be a 'motivating factor in the defendant's challenged employment decision.' For a § 1981 claim, however, 'a plaintiff bears the burden of showing that race was a but-for cause of [her] injury.'") (quoting *Comcast Corp.*, 589 U.S. at 333, citing *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019)). And here, Ms. Ohaeme did not address this burden, argue that her evidence meets it, or otherwise mention a § 1981 racial harassment claim at all. The Court finds that she has therefore abandoned such a claim, *Bonte*, 624 F.3d at 466; *Bombard*, 92 F.3d at 562 n.2; *Hayes*, 2006 WL 1897959, at *7, and that Andy Mohr is entitled to summary judgment. The Court **GRANTS** Andy Mohr's Motion for Summary Judgment as to Ms. Ohaeme's claim of racial harassment under § 1981.

In sum, the Court **GRANTS** Andy Mohr's Motion for Summary Judgment on Ms. Ohaeme's § 1981 harassment claims.

## F.    Section 1981 Discrimination Claims Based on Constructive Discharge

The same discussion and analysis above regarding Ms. Ohaeme's § 1981 harassment claims applies here.

1.      *Gender Discrimination Based on Constructive Discharge*

Ms. Ohaeme has pled a gender-based discrimination claim based on constructive discharge under § 1981, but § 1981 only applies to claims of racial discrimination.  *See* discussion *supra* Part IV.E.1.  Accordingly, the Court **GRANTS** Andy Mohr's Motion for Summary Judgment as to Ms. Ohaeme's claim for sex-based discrimination due to constructive discharge in violation of § 1981.

2.      *Race-Based & National Origin-Based Discrimination Based on Constructive Discharge*

Similar to the § 1981 analysis above, Ms. Ohaeme focuses only on responding to Andy Mohr's Title VII arguments and does not defend or otherwise mention her § 1981 claims of discrimination based on her race and national origin due to constructive discharge.  [*See* Filing No. 72.]  Accordingly, the Court **GRANTS** Andy Mohr's Motion for Summary Judgment as to Ms. Ohaeme's claims for race-based and national origin-based discrimination due to constructive discharge in violation of § 1981.  *See* discussion *supra* Part IV.E.2; *Bonte*, 624 F.3d at 466; *Bombard*, 92 F.3d at 562 n.2; *Hayes*, 2006 WL 1897959, at *7.

In sum, the Court **GRANTS** Andy Mohr's Motion for Summary Judgment as to Ms. Ohaeme's § 1981 discrimination claims based on constructive discharge.

## G.      Title VII and § 1981 Retaliation Claims Based on Constructive Discharge

Andy Mohr argues that Ms. Ohaeme's claim of constructive discharge in retaliation for her complaints regarding harassment fails because "she cannot meet the unbearable high burden required for constructive discharge."  [Filing No. 51 at 34 (quotations omitted).]

Ms. Ohaeme argues that she has a prima facie claim for both Title VII and § 1981 retaliation based on constructive discharge after Mr. Hurst's comment about terminating her for future complaints.  [Filing No. 72 at 26-27.]

Andy Mohr reiterates its argument in reply.  [Filing No. 67 at 19.]

Title VII has an anti-retaliation provision that prohibits an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). This "provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Section 1981 also encompasses retaliation claims. *Stephens*, 569 F.3d at 786 (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008)).

In order to succeed on a retaliation claim under Title VII and § 1981, Ms. Ohaeme must produce evidence from which a reasonable jury could conclude that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 748 (7th Cir. 2021); *Stephens*, 569 F.3d at 786 (retaliation claims under Title VII and § 1981 have the same elements). As covered above, "constructive discharge constitutes an adverse employment action." *Chapin*, 621 F.3d at 679 (citation omitted).

Here, Ms. Ohaeme engaged in a statutorily protected activity by reporting instances of harassment to her supervisors, and the Court has already found that she has submitted evidence from which a reasonable jury could conclude that she suffered an adverse action in the form of constructive discharge after Mr. Hurst's comments regarding termination. Lastly, although the element of causation is not challenged, the Court notes that a jury could find a sufficient causal link since Mr. Hurst explicitly mentioned how he was tired of her complaints and would terminate her if she continued to complain. Andy Mohr's Motion for Summary Judgment is **DENIED** as to Ms. Ohaeme's claims of retaliation in the form of constructive discharge under both Title VII and

§ 1981.

# V.
## CONCLUSION

Ms. Ohaeme's version of events—which the Court must accept as true at this stage of the litigation—details a misogynistically and racially-charged workplace that poisoned the work environment.  Specifically, she experienced a two-year period of employment during which she encountered several anti-female and racist comments and nicknames from both managers and co-workers, and interference with her work and compensation, which ended with her resignation after being told by the General Manager that she would be terminated if she continued to complain about harassment.  She has presented sufficient evidence for a reasonable jury to find in her favor on several of her claims.

For the foregoing reasons, the Court:

- **OVERRULES** Andy Mohr's objections as to Ms. Ohaeme's reliance on the testimony of Mr. Hurst and Mr. Burd;

- **DENIES** Andy Mohr's Motion for Summary Judgment, [48], as follows:

  - to the extent the Court finds that Ms. Ohaeme adequately exhausted all of her Title VII claims in her EEOC Charge;

  - to the extent the Court finds that Ms. Ohaeme has presented sufficient evidence from which a reasonable jury could conclude that she suffered actionable sex-based harassment by her co-workers in violation of Title VII;

  - to the extent the Court finds that Ms. Ohaeme has presented sufficient evidence from which a reasonable jury could conclude that she suffered actionable sex-based harassment by her supervisors in violation of Title VII based on the actions of reassigning customers and split deals;

  - to the extent the Court finds that Ms. Ohaeme has presented sufficient evidence from which a reasonable jury could conclude that she suffered actionable race-based harassment by her co-workers in violation of Title VII;

- o to the extent the Court finds that Ms. Ohaeme has presented sufficient evidence from which a reasonable jury could conclude that she suffered actionable race-based harassment by her supervisors in violation of Title VII based on the actions of reassigning customers and split deals;

- o to the extent the Court finds that Ms. Ohaeme has presented sufficient evidence from which a reasonable jury could conclude that she suffered sex-based discrimination under Title VII in the form of disparate treatment based on a discriminatory application of policy regarding customer and sales assignments;

- o to the extent the Court finds that Ms. Ohaeme has presented sufficient evidence from which a reasonable jury could conclude that she suffered discrimination under Title VII based on a constructive discharge in anticipation of termination;

- o to the extent the Court finds that Ms. Ohaeme has presented sufficient evidence from which a reasonable jury could conclude that she suffered retaliation in the form of constructive discharge under both Title VII and § 1981; and

- **GRANTS** Andy Mohr's Motion for Summary Judgment, [48], as follows:

  - o to the extent it finds that there is no Title VII hostile work environment claim based on national origin in this case;

  - o to the extent that it finds that Andy Mohr is entitled to judgment as a matter of law on Ms. Ohaeme's claim for sex-based harassment under § 1981;

  - o to the extent that it finds that Andy Mohr is entitled to judgment as a matter of law on Ms. Ohaeme's claim for race-based harassment under § 1981;

  - o to the extent that it finds that Andy Mohr is entitled to judgment as a matter of law regarding Ms. Ohaeme's Title VII claims for racial and national origin disparate treatment based on discriminatory assignment of sales and split deals;

  - o to the extent finds that Andy Mohr is entitled to judgment as a matter of law on Ms. Ohaeme's Title VII claims of constructive discharge in the form of discriminatory harassment; and

  - o to the extent it finds that Andy Mohr is entitled to judgment as a matter of law on Ms. Ohaeme's claims for sex-based, race-based, and national

origin-based discrimination due to constructive discharge in violation of § 1981.

No partial final judgment shall issue.

The following claims remain for trial:

- Gender and race discrimination in the form of co-worker harassment in violation of Title VII;

- Gender and race discrimination in the form of supervisor harassment based on the actions of reassigning customers and split deals in violation of Title VII;

- Gender discrimination in the form of disparate treatment based on a discriminatory application of policy regarding customer and sales assignments;

- Discrimination in the form of constructive discharge based on the anticipation of termination under Title VII; and

- Retaliation in the form of constructive discharge based on anticipation of termination due to Mr. Hurt's comments about future complaints in violation of both Title VII and § 1981.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable to address the possibility of reaching an agreed resolution, and if none exists, the anticipated length of trial.

Date: 12/2/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF to all counsel of record**